2005 UT 72

**STATE of Utah, Plaintiff and Appellee,**

v.

**Arthur Anthony GONZALES, Defendant and Appellant.**

No. 20020935.

Supreme Court of Utah.

Nov. 4, 2005.

Mark L. Shurtleff, Att'y Gen., Marian Decker, Asst. Att'y Gen., Michaela D. Andruzzi, Salt Lake City, for plaintiff.

Kent R. Hart, Salt Lake City, for defendant.

Gregory G. Skordas, Jack M. Morgan, Salt Lake City, Douglas E. Beloof, Liana Jeanheh Reeve, Portland, OR, for State of Utah amicus.

NEHRING, Justice:

¶1 Arthur Anthony Gonzales appeals his conviction for attempted rape and forcible sexual abuse. Mr. Gonzales challenges the trial court's rulings quashing a subpoena for the victim's mental health records, removing his counsel, and denying him the opportunity to cross-examine the victim about her previous juvenile adjudications. He also claims that his attorney rendered ineffective assistance, and that, cumulatively, all these errors require reversal. We affirm.

## FACTS

¶2 Elizabeth Snodgrass and her sixteen-year-old daughter Jessica moved next door to Mr. Gonzales and his children in 1999. Ms. Snodgrass and Mr. Gonzales began dating and became engaged. During the engagement, each maintained a separate residence, but they began to blend their families with activities such as joint dinners.

¶3 Mr. Gonzales and Ms. Snodgrass began to discuss their differences in discipline, which was creating contention between the two families. When disagreements over parenting styles would arise, Mr. Gonzales and Ms. Snodgrass would host "table talks" to discuss the issue. One of these meetings was held after Ms. Snodgrass broke off the engagement when Jessica accused Mr. Gonzales of grabbing her buttocks and pressing himself against her during a hug. After discussing the matter with the family, Ms. Snodgrass concluded Jessica either was lying or misunderstood Mr. Gonzales's actions and subsequently recommitted to marry Mr. Gonzales.

¶4 On the Saturday before the planned wedding, Mr. Gonzales drove Ms. Snodgrass to work. When he dropped her off, Ms. Snodgrass took only her office keys, leaving her car and house keys with Mr. Gonzales. Around 9:00 a.m., Mr. Gonzales told his daughter that he was going next door to do laundry. Access to the laundry room could only be gained by passing through Jessica's bedroom. At approximately 10:00 a.m., Mr. Gonzales again told his daughter he was going to check on the laundry.

¶5 Jessica alleged that around that same time, she felt a man crawl into her bed and put his arms around her. He began to rub his pelvis against her backside and to "hump" her on her buttocks. She says that when she saw the man's hand, she knew it was Mr. Gonzales. He put his hand under her shirt and bra and started touching her breasts, to which she responded by stating "no." He said "it's okay" and then pulled down her pants and underpants, grabbed her buttocks, and placed his finger inside of her vagina. He then rubbed his penis on her buttocks before placing it between her legs and tried to penetrate her. At that point, Jessica put her feet against the wall and pushed Mr. Gonzales off of the bed. She told him it wasn't right and that "this is not what fathers and daughters do." According to Jessica, Mr. Gonzales warned her not to tell anyone because no one would believe her and that he would give her whatever she wanted. She also said that Mr. Gonzales asked her not to notify the police.

¶6 In Mr. Gonzales's version of events, he kneeled on Jessica's bed to wake her up. He put his arms around and under her while calling her by her nickname and saying, "Come on ... let's go ... I need your help."

Jessica then became "irate" and began yelling at him. He threw his hands in the air and told her if she was hungry to come over and eat and repeated that he needed her help.

¶ 7 After Mr. Gonzales left, Jessica called her friend Anjali, who testified that Jessica was scared and upset. Jessica also spoke with Anjali's father, Rajiv Kulkarni. He testified that Jessica was crying and upset when he spoke to her that morning. Mr. Kulkarni called the police, and then went to pick up Jessica, leaving his car parked about a block away. Jessica came running toward Mr. Kulkarni, carrying her bed sheets. Jessica suspected that some of the stains on her sheets might be semen. Mr. Kulkarni drove Jessica to meet with the police. During her police interview, Jessica told police that a week before this incident Mr. Gonzales had tried to hypnotize her, asked her to remove her clothing, and touched her breast.

¶ 8 The morning of the incident, Mr. Gonzales paged Ms. Snodgrass twice. The second time, he included a "911" along with his cell phone number, indicating to her that she needed to call back immediately. Ms. Snodgrass called Mr. Gonzales, who said he thought he scared Jessica when he awoke her for breakfast and that she may have run away.

¶ 9 The police officers who interviewed Mr. Gonzales said that he admitted "wrestling" with Jessica. Jessica was not tested for seminal fluid or other physical evidence. No semen was found on Jessica's sheets or pants.

## PROCEDURAL HISTORY

¶ 10 Mr. Gonzales was charged with one count of attempted rape and one count of forcible sexual abuse. Despite having appointed counsel, Mr. Gonzales filed a pro se motion stating that Jessica's claim was a retaliation against an unwanted marriage. He also claimed, apparently to suggest that Jessica's ability to tell the truth was impaired, that Jessica was undergoing psychological therapy, and that she was taking medicine for a psychological condition. Mr. Gonzales's counsel withdrew and the trial

court appointed Mr. Edward Montgomery as new counsel.

¶ 11 Although Mr. Gonzales's motion was filed without the knowledge or over the objection of his attorney, the matters raised in it were at the core of his defense. His effort to advance the cause of his theory that his accuser was a mentally disturbed teen bent on retaliation gives rise to the first issue that we decide today: the admissibility of Jessica's mental health records.

## I. THE SUBPOENAS FOR JESSICA'S MENTAL HEALTH RECORDS

¶ 12 Mr. Montgomery served a subpoena on the University of Utah Neuropsychiatric Institute (UNI) for Jessica's treatment records. UNI responded with a letter stating that the records were privileged under Utah Rule of Evidence 506 and could only be released if an affidavit attesting that the request for records satisfied an exception to the privilege. Mr. Montgomery completed an affidavit for medical records entitled "PATIENT HAS PLACED MENTAL OR PHYSICAL CONDITION AT ISSUE AS A CLAIM OR DEFENSE IN A LAWSUIT" and checked the boxes indicating that Jessica's mental and physical condition were "an element of a claim or defense in this lawsuit." UNI sent Jessica's treatment records directly to Mr. Montgomery. Not long after Mr. Montgomery received the records, UNI's general counsel called him to say that a mistake had been made; UNI should not have released the records; and instead, should have moved to quash the subpoena.

¶ 13 Investigators retained by Mr. Gonzales's counsel also contacted Ms. Snodgrass at her home and attempted to serve her with subpoenas seeking the names of Jessica's mental health providers. These actions prompted the prosecutor to request that any contact with State witnesses should be made through her. The prosecutor also told Mr. Montgomery to serve subpoenas on mental health service providers directly, but indicated an intention to move to quash any subpoenas regarding Jessica's mental health. On April 2, 2002, Mr. Montgomery served subpoenas on two of Jessica's private therapists.

¶ 14 At a pre-trial conference, the State challenged Mr. Gonzales's acquisition of the UNI treatment records. Having learned that the records had been obtained by Mr. Montgomery, the State sought to have them turned over to the court. The State asserted that Mr. Montgomery had obtained the documents improperly because he had signed the form provided by UNI as a condition to its release of Jessica's treatment records that included the false representation that Jessica had placed her mental or physical condition at issue.

¶ 15 Mr. Montgomery admitted that he looked at the records, but said that after UNI general counsel alerted him that UNI believed that he had acquired the records improperly, he safe-guarded them until the matter was resolved. The trial court ordered Mr. Montgomery to submit the records to the court and the trial court sealed them, conditioning their disclosure on the acquisition of a court order.

¶ 16 At a subsequent hearing on the fate of the records, the State sought to quash the subpoenas for the records and to exclude any evidence obtained from them. The State argued that Mr. Montgomery's access to the records had been gained fraudulently and that, by inspecting them, Mr. Montgomery had violated Jessica's rights. Mr. Montgomery replied that Jessica's mental state was an element of the defense. Mr. Montgomery understood Jessica's relevant mental state to be an inability to tell the truth. Thus, he argued, because of the likelihood of finding exculpatory evidence that Jessica "cannot be believed" in her mental health records, the defense was entitled to an in camera review under *State v. Cardall*, 1999 UT 51, 982 P.2d 79.

¶ 17 Mr. Montgomery also stated that Mr. Gonzales had independent knowledge of Jessica's severe emotional problems because Mr. Gonzales personally knew of Jessica's medical conditions and had attended one of her therapy sessions. Mr. Montgomery therefore asserted that the records were obtained for good cause and through proper procedures.

¶ 18 The trial court disagreed and quashed the subpoenas for the records. The court further ruled that the information obtained from the records could not be used at trial, and noted that Mr. Montgomery had created a possibly insurmountable conflict of interest, as "it is impossible to divorce defense counsel's knowledge obtained from the privileged information from his knowledge of the rest of the case." Three days later, Mr. Montgomery submitted a motion to withdraw, which the trial court granted. Ms. Janet Miller replaced Mr. Montgomery as Mr. Gonzales's trial counsel.

## II. TRIAL TESTIMONY

¶ 19 Once the case went to trial, Ms. Miller moved in limine to exclude evidence concerning Mr. Gonzales's previous firearms and drug possession convictions, as well as two prior accusations of sexual misconduct made by Jessica. The trial court allowed introduction of the prior convictions for the limited purpose of impeaching Mr. Gonzales. The court deferred ruling on the admissibility of Jessica's uncharged allegations until the evidence was presented.

¶ 20 On direct examination, Ms. Miller asked Mr. Gonzales if he had ever been accused of sexual assault. Mr. Gonzales answered that he had not. Outside of the presence of the jury, the State argued that Ms. Miller had opened the door for admission of prior bad acts. The State sought permission to introduce details of past accusations of sexual assault made by Jessica against Mr. Gonzales. The trial court allowed the evidence. On cross-examination, Mr. Gonzales admitted to trying to hypnotize Jessica, but denied touching her sexually or asking her to remove her shirt.

¶ 21 Mr. Gonzales testified that his children were his "life." This led the prosecutor to ask Mr. Gonzales, if this was so, why he owed $47,000 in child support arrears. Ms. Miller initially objected to this question on the grounds of foundation, but later withdrew her objection. Mr. Gonzales then admitted to owing the money.

¶ 22 Finally, Ms. Miller sought to admit evidence of Jessica and Anjali's retail theft convictions for purposes of impeachment. The trial court rejected the evidence under

Utah Rule of Evidence 609 as inadmissible misdemeanor theft convictions that do not involve dishonesty.

¶ 23 The jury convicted Mr. Gonzales of both attempted rape, a first degree felony, and forcible sex abuse, a second degree felony. This appeal followed.

## ISSUES

¶ 24 Mr. Gonzales raises five issues: (1) that the trial court erred in granting the State's motion to quash subpoenas for Jessica's mental health records from UNI; (2) that by removing Mr. Gonzales's counsel for having a conflict of interest, the trial court denied him the right to the counsel of his choice; (3) that the trial court erred in denying Mr. Gonzales the opportunity to cross-examine the victim and her friend about prior juvenile convictions; (4) that his attorney rendered ineffective assistance of counsel by opening the door to prior bad acts and also by withdrawing an objection to irrelevant prejudicial evidence; and (5) that the errors in the trial, if they do not individually warrant reversal, cumulatively merit a new trial.

## ANALYSIS

### I.   MOTION TO QUASH

■ ¶ 25 Mr. Gonzales claims that the trial court erred when it quashed the subpoenas for the victim's mental health records. Although Mr. Gonzales raises complex evidentiary issues, the real issue is actually very narrow: did the trial court err in quashing the subpoenas? We conclude that it did not. The trial court supported its decision to quash[1] the subpoenas in two ways: first, because Mr. Montgomery failed to notify opposing counsel of the subpoenas, and second, because Mr. Montgomery failed to turn the records over to the court for an in camera review of the privileged information before inspecting the contents of the records. Mr. Gonzales argues that the process by which

his attorney obtained and reviewed the records was not flawed. We review for correctness the trial court's conclusion of law that Mr. Gonzales failed to follow the proper procedures for subpoenaing documents. *State v. Pena*, 869 P.2d 932, 936 (Utah 1994). We affirm.

### A.   Subpoena of Records Without Notifying the Prosecution, Victim, or Trial Court

■ ¶ 26 Mr. Gonzales first argues that he had no duty to notify either the State or the court of his pending subpoenas to UNI. He relies on rule 14 of the Utah Rules of Criminal Procedure, which states:

The clerk of the court in which a case is pending shall issue in blank to the defendant, without charge, as many signed subpoenas as the defendant may require. An attorney admitted to practice in the court in which the action is pending may also issue and sign a subpoena as an officer of the court.

A subpoena may command the person to whom it is directed to appear and testify or to produce in court or to allow inspection of records, papers, or other objects.

Utah R.Crim. P. 14(a), (b). This rule does not specifically require a party seeking a subpoena to notify anyone of his intention, and therefore, according to Mr. Gonzales, Mr. Montgomery acted properly when he subpoenaed Jessica's records from UNI.

¶ 27 The text of rule 14 does not, however, end the discussion of this matter. The Utah Rules of Criminal Procedure are subject to some of the requirements of the Utah Rules of Civil Procedure. Prominent among these is civil rule 81(e), which states, "[t]hese rules of [civil] procedure shall also govern in any aspect of criminal proceedings where there is no other applicable statute or rule, provided, that any rule so applied does not conflict with any statutory or constitutional requirement." Utah R. Civ. P. 81(e). The rules of civil

---

1. We note initially that, although the trial court used the term "quash," and we continue to do so here, the circumstances of this case do not follow the typical sequence of quashing events. Ordinarily, a trial court quashes a subpoena before the records are obtained. Here, however, the trial court set aside information found in records that had already been obtained citing a failure to comply with proper procedures. The trial court did so in a retroactive attempt to right the wrongs that had been created by Mr. Montgomery's premature acquisition of Jessica's mental health records. The trial court referred to its actions as "quashing," a term we adopt.

procedure mandate notice to parties of an attempt to procure documents by subpoena. Specifically, civil rule 45(b) requires "[p]rior notice of any commanded production or inspection of documents ... before trial shall be served on each party in the manner prescribed by Rule 5(b)."[2] Utah R. Civ. P. 45(b).

¶ 28 Mr. Gonzales contends that civil rule 81's general incorporation language does not merge civil rule 45's notice requirement into criminal rule 14. He understands criminal rule 14 to be an independent, stand-alone rule that communicates all there is to say about subpoenas in criminal cases. Its silence on notice is, according to Mr. Gonzales, an affirmative declaration that notice is not required. Thus, criminal rule 14 serves as the "other applicable rule" on the subject of notice, rendering it immune from the incorporation language of civil rule 81.

¶ 29 The applicability of civil rule 81 cannot be determined merely by comparing rule titles, index entries, or the contents of the rules of criminal and civil procedure. Instead, our "applicable statute or rule" analysis obliges us to consider the text and purpose of a rule of criminal procedure against the text and purposes of the related statutes and rules, and thereby determine whether an applicable rule of civil procedure should be grafted onto a rule of criminal procedure through civil rule 81. An inquiry central to this task is the assessment of what more a civil rule may permit or require than the criminal rule on a similar topic, and what reasons, if any, justify the differences.

¶ 30 The civil subpoena rules are both more comprehensive and more exacting than the criminal rules. For example, criminal rule 14(b) states that the court may quash or modify a subpoena if compliance is "unreasonable," but provides no further guidance. Utah R.Crim. P. 14(b). In contrast, civil rules 45(c)(3)(A) and (B) each provide for four occasions when the court may quash or modify the subpoena, and provide direction

for doing so. Utah R. Civ. P. 45(c)(3)(A), (B). Similarly, civil rule 45 expressly addresses the status of unsubpoenaed persons who are present in the courtroom whose testimony is sought, while criminal rule 14 does not. Criminal rule 14 also does not specify what information is required to appear in a subpoena, such as name or address, whereas civil rule 45(a) provides detailed instructions concerning the contents of any subpoena.

¶ 31 In evaluating the merits of Mr. Gonzales's interpretation that criminal rule 14's silence regarding notice is intentional, we note that the text of rule 14(b) clearly signals that some notice to adverse parties of the issuance of a subpoena is contemplated. It expressly authorizes trial courts to quash or modify unreasonable subpoenas. In doing so, criminal rule 14(b) was not inviting unilateral action by trial courts. Rather, the rule expects those parties affected by unreasonable compliance to seek relief from the court. Of course no application for an order to quash or modify could be made by an adversely affected party who received no notice of the subpoena.

¶ 32 Policy considerations underlying civil rule 45(b) reinforce the right of an opposing party to be informed of subpoenas for documents. The Advisory Committee Note describing the addition of the notification requirement to civil rule 45 states, "[Rule 45(b)(1)(A)] ensures that other parties will have notice enabling them to object or participate in discovery, or to serve a demand for additional materials." Utah R. Civ. P. 45 Adv. Note. This policy applies equally to the rules of criminal procedure; the right of a victim of a crime to be aware of any subpoenas concerning privileged information is at least as important as the same right of a civil defendant.[3] "[T]he fundamental requisite of due process of law is the opportunity to be heard, a right which has little reality or worth unless one is informed that the matter is pending and one can choose for himself

---

2. Rule 5(b) outlines the rules governing proper service.

3. Mr. Gonzales was aware that the State felt strongly about this issue. In this case, the prosecution had previously advised Mr. Gonzales that

the victim did not intend to waive her privilege to her mental health records, and accordingly, the prosecution would move to quash any subpoenas for them.

whether to contest." *Worrall v. Ogden City Fire Dep't.*, 616 P.2d 598, 601 (Utah 1980).

¶ 33 The Utah legislature has codified its intent "to ensure that all victims ... of crime are treated with dignity, respect, courtesy, and sensitivity, and that the rights ... to victims ... are honored and protected by law." Utah Code Ann. § 77–37–1 (2003). When a victim's confidential records are reviewed before she even knows they are subpoenaed, she cannot choose to protect them. The only way to prevent this is to ensure that the party receives notification that a subpoena has been issued. In light of the purpose behind the notification requirements of civil rule 45, it is clear that the same policies must apply in a criminal setting to protect the rights of victims.

¶ 34 Similar policy considerations have contributed to our earlier application of civil rule 81(d) to the rules of criminal procedure. *See, e.g., State v. Walker,* 743 P.2d 191, 192–93 (Utah 1987) (applying civil rule 52(a) to a criminal matter), *State v. Bell,* 770 P.2d 100, 109 (Utah 1988) (applying civil rule 49 to a criminal matter),[4] and *State v. Anderson,* 797 P.2d 1114, 1116–17 (Utah 1990) (applying civil rule 58A to a criminal matter).

¶ 35 Mr. Gonzales argues that civil rule 45 cannot be applied to his case under our holding in *State v. Nielsen,* 522 P.2d 1366 (Utah 1974), in which we determined that the rules of civil procedure did not apply to discovery in a criminal matter. *See id.* at 1367. Mr. Gonzales culls language from that case which stated, without analysis, "the Rules of Civil Procedure pertaining to discovery may not be used in criminal cases." *Id.* However, *Nielsen* is easily distinguished from this case and thus does not hinder our holding here.

¶ 36 The defendant in *Nielsen* was charged with a felony and a misdemeanor. Mr. Nielsen claimed the right to take depositions of various witnesses. The State sought a court declaration as to whether or not the defendant was entitled to pursue discovery under the Utah Rules of Civil Procedure. At the time, the rules of criminal procedure were codified in the Utah Code. Utah Code section 77–46–1, which governed the taking of depositions stated that "[w]hen a defendant has been held to answer a charge for a public offense ... he may, either before or after an indictment or information, have witnesses examined conditionally on his behalf as prescribed in this chapter, and *not otherwise.*" Utah Code Ann. § 77–46–1 (1978) (emphasis added). We read "not otherwise" to mean that a defendant could access no other discovery tool, including the rules of civil procedure. We therefore concluded that "[i]t appears that the wording of the statutes above set forth makes Rule 81(e) inapplicable and that the Rules of Civil Procedure pertaining to discovery may not be used in criminal cases." *Nielsen,* 522 P.2d at 1367. We noted that "until such time as the [relevant] statutes ... are modified or repealed by the legislature this court would be without power to provide for discovery proceedings by court rule." *Id.* Utah Code section 77–46–1 (1978) was repealed in 1980, and no longer exists in that form.[5] Accordingly, there now exists no prohibition against using the rules of civil procedure to inform discovery in a criminal matter.

¶ 37 Furthermore, we stated in *Nielsen* that there was a sound policy reason not to apply civil rule 30's broad use of depositions

4. At the time *Walker* and *Bell* were issued, Utah Code section 77–35–26(g) provided that "[t]he rules of civil procedure relating to appeals shall govern criminal appeals to the Supreme Court except as otherwise provided." Utah Code Ann. § 77–35–26(g) (1982). This chapter was repealed in 1990 and the Supreme Court adopted the rules of procedure as provided in the Utah Court Rules Annotated.

5. The statutes at issue in *Nielsen* were 77–46–1 and 77–46–2 (1978). In 1980, Title 77 was repealed, reorganized, and reenacted, again as Title 77. Former chapter 46 was reenacted as Utah Code section 77–35–14 (1982). Former

section 77–46–1 did not survive the repeal and does not appear in Utah Code section 77–35–14 (1982). Former section 77–46–2, on the other hand, reemerged more or less intact as Utah Code section 77–35–14(h) (1980). In 1989, the legislature repealed the entirety of chapter 35 of Title 77. The Utah Supreme Court adopted the statutory rules of procedure contained in Utah Code sections 77–35–1 to –33 (1982 & Supp. 1988) and transformed them into the current Utah Rules of Criminal Procedure. Section 77–35–14(h) (1982) is currently located at rule 14(h). The former section 77–46–1, discussed here, no longer exists.

to a criminal case, noting that such application may well infringe a defendant's constitutional right against self-incrimination. *Id.* Mr. Gonzales's case, however, marks the emergence of an equally persuasive policy reason to apply the rules of civil procedure to a criminal case—an obligation to give practical effect to the statutory mandate that a victim's interest be meaningfully considered. The circumstances present here underscore why *Nielsen* should not be read to create an inflexible prohibition against the application of civil procedure rules to discovery in criminal matters.

¶ 38 Mr. Gonzales further attempts to buttress his argument by invoking *State v. Pliego,* 1999 UT 8, 974 P.2d 279, in which we directed a defendant to subpoena the victim's mental health records, and *State v. Hansen,* 2002 UT 114, 61 P.3d 1062, in which we applied the rule of *Pliego* to privately held documents. However, these cases do not stand for the propositions that Mr. Gonzales advances.

¶ 39 Mr. Gonzales correctly states that in *Pliego,* we directed the defendant to subpoena the rape victim's mental health records. He suggests that this statement allows any defendant to subpoena a rape victim's mental health records. However, to the extent that *Pliego* mandates a procedure for acquiring mental health records by subpoena, it is limited by the facts presented to us in that case. The *Pliego* result emerged in the context of rejecting the defendant's preferred discovery technique of seeking a court order requiring the prosecution to subpoena the records under rule 16(a) of the Utah Rules of Criminal Procedure.[6] *Pliego,* 1999 UT 8 at ¶ 20, 974 P.2d 279. We affirmed the trial court's ruling that this would place too great a burden on the prosecution, and if the defendant wanted to see the records, he should subpoena them himself. *Id.* We neither stated nor implied that subpoenas could or should be served without notification to opposing counsel.

¶ 40 Mr. Gonzales also relies on our statement in *Hansen* that "[i]n order to obtain privileged mental health records, a party must first 'serv[e] the holders of [those] records with a subpoena duces tecum.'" *Hansen,* 2002 UT 114, ¶ 6 n. 1, 61 P.3d 1062 (some brackets in original). (quoting *Pliego,* 1999 UT 8 at ¶ 21, 974 P.2d 279). Again, Mr. Gonzales reads too much into this simple statement; we neither stated nor implied that serving subpoenas on holders of privileged records can be done without notification to the court and opposing counsel, or that a defendant is entitled to examine the records without an in camera review.

¶ 41 Accordingly, we hold that rule 45(b)(1)(A)'s notification requirement applies to criminal matters where privileged information is at stake. Because Mr. Gonzales's attorney improperly subpoenaed Jessica's private mental health records in violation of her right to privacy, we affirm the trial court's ruling that the subpoenas must be quashed.

### B. Failure to Turn Records Over to Court for In Camera Review

¶ 42 Next, Mr. Gonzales argues that he was entitled to review Jessica's mental health records because her mental health is an element or claim of his defense. Utah Rule of Evidence 506, which defines a privilege between a patient and a mental health therapist, excludes communications that concern a patient's condition where the condition is "an element of any claim or defense." This is the same wording that is found on the UNI form that Mr. Montgomery filled out. Mr. Gonzales argues that Jessica's mental health was an element of a claim or defense in the lawsuit, and therefore his request for the records was proper.

¶ 43 Mr. Gonzales's argument is flawed in two ways. First, his defense is simply "I didn't do it." He wishes to use Jessica's mental health records to impeach her credibility as a witness–part of his defense strategy, but not actually an element of his defense. Second, regardless of whether

---

**6.** Rule 16(a) requires the prosecutor to disclose to the defendant various pieces of evidence relevant to the defendant's case. However, in *Pliego,* we clarified that this rule is limited to only that evidence "of which [the prosecutor] has knowledge. It does not require [the prosecutor] to make an investigation on behalf of the defendant." *Pliego,* 1999 UT 8 at ¶ 9, 974 P.2d 279.

Jessica's mental health is an "element" of Mr. Gonzales's defense, it is the process by which the records were obtained, not the status of the records as privileged or un-privileged, that prevents Mr. Gonzales from reviewing them. Even if it were true that the records were an element of the defense, or were never privileged in the first place, Mr. Gonzales would still be obligated to obtain them using the proper avenue.

¶ 44 Mr. Montgomery used a flawed subpoena process to obtain privileged records.[7] His authority to examine those records, however obtained, depended on approval of the trial court following an in camera review. Drawing on a United States Supreme Court case, *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), we made this clear in *State v. Cardall*, 1999 UT 51, 982 P.2d 79.[8] We stated:

> In *Ritchie*, the Supreme Court held that where an exception to privilege allows a defendant access to otherwise confidential records, the defendant does not have the right to examine all of the confidential information or to search through state files without supervision. However, if a defendant can show with reasonable certainty that exculpatory evidence exists which would be favorable to his defense, *Ritchie* gives him the right to have the otherwise confidential records reviewed by the trial court to determine if they contain material evidence.
>
> . . .
>
> [W]here "a defendant is aware of specific information contained in the file . . ., he is free to request it directly from the court, and argue in favor of its materiality."

*Cardall*, 1999 UT 51 at ¶¶ 30, 32, 982 P.2d 79 (citations omitted).

¶ 45 Here, Mr. Montgomery was obligated to seek an in camera review of Jessica's mental health records before searching through them. Because he did not follow proper procedures in subpoenaing the records or requesting an in camera review, we affirm the trial court's conclusion that the subpoenas must be quashed.

## II. ORDER TO WITHDRAW

¶ 46 Mr. Gonzales next argues that the trial court's grant of the State's motion to quash and accompanying ruling that Mr. Montgomery now had a conflict of interest denied him his right to the counsel of his choice. This issue is moot because the trial court did not remove Mr. Montgomery. Rather, the trial court responded to Mr. Montgomery's unauthorized acquisition of the contents of Jessica's therapy records by ordering him to write an apology to the victim, questioning whether the trial could be fair under the circumstances, and suggesting that he had created a conflict that "call[ed] into question the professional ethics of his continued representation of the defendant." Following this strong reprimand, Mr. Montgomery voluntarily moved to withdraw. The trial court granted the motion, and referred the case to the Salt Lake Legal Defenders Association for appointment of new counsel. On appeal, Mr. Gonzales suggests that "less drastic options" might have been appropriate. However, because Mr. Gonzales did not offer these options at trial or even object to the trial court's grant of Mr. Montgomery's motion to withdraw, this issue is not properly before us, and we do not review it.[9]

7. It is not in dispute that UNI erroneously released the records to Mr. Montgomery based upon an affidavit that he signed asserting that Jessica's mental state was an element of the crime. Everyone agrees that UNI should properly have moved to quash the subpoena itself, rather than turning the records over to Mr. Montgomery. That UNI could have and likely should have acted to protect its patient's privacy interest in no way diminishes our conviction that Mr. Montgomery was obligated by rule to notify the State of the UNI subpoenas.

8. We have since issued another case, *State v. Blake*, 2002 UT 113, 63 P.3d 56, in which we

discussed this at length. *Blake*, however, was not available at the time Mr. Montgomery obtained the records or at the time the trial court issued its decision. Accordingly, we rely on *Cardall*, which adequately explained the law in Utah at the time.

9. Mr. Gonzales also argued that if we were to determine that the records reasonably contained exculpatory evidence, then the trial court would have erred in suggesting that a conflict had been created. However, we need not address this issue because it is irrelevant to the matter at hand in light of Mr. Montgomery's voluntary withdrawal of his services.

## III. RIGHT TO CROSS–EXAMINE

¶ 47 We now turn to Mr. Gonzales's claim that the trial court erred when it denied his motion in limine seeking leave to cross-examine Jessica and Anjali about their prior juvenile adjudications for shoplifting. This question appears to be a straightforward question of evidence, which is how the trial court viewed it, and has embedded within it is the constitutional question of whether the trial court infringed Mr. Gonzales's right of confrontation by denying him the opportunity to ask Jessica and Anjali about their juvenile adjudications. However, denial of the right to confront and cross-examine witnesses presents a question of law which is reviewed for correctness. *Lander v. Indust. Comm'n of Utah,* 894 P.2d 552, 554 (Utah Ct.App.1995).

¶ 48 The Sixth Amendment right to confrontation "guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.'" *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (quoting U.S. Const. amend. VI). Cross-examination is the tool that gives practical effect to the right of confrontation. *Id.* Through its use, an accused can test the believability and truthfulness of a witness's testimony. *Id.* at 315–16, 94 S.Ct. 1105. However, "the right of cross-examination is not without limitation." *State v. Hackford,* 737 P.2d 200, 203 (Utah 1987). For example, "the right to cross-examine 'does not entail the right to harass, annoy, or humiliate [the] witness on cross-examination, nor to engage in repetitive questioning, nor to inquire into matters which would expose the witness to danger of physical harm.'" *Id.* (quoting *State v. Ches-*

*nut,* 621 P.2d 1228, 1233 (Utah 1980)). Likewise, Utah Rule of Evidence 403 excludes relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

¶ 49 At trial, Mr. Gonzales made a motion in limine seeking leave to cross-examine Jessica and Anjali about their shoplifting adjudications. His motion was primarily grounded in rule 609 of the Utah Rules of Evidence, which governs the admissibility of prior criminal convictions. Mr. Gonzales explained that he sought to use the juvenile adjudications to counter any statements that Jessica and Anjali might make in support of their veracity. He intended to use their shoplifting adjudications to refute these potential claims to honesty.

¶ 50 Rule 609(a) permits the introduction of prior convictions for the purpose of attacking the credibility of a witness, but only if the conviction was for a felony or a crime that involved dishonesty. Utah R. Evid. 609(a).

¶ 51 Rule 609(d) governs the use of prior juvenile adjudications to attack credibility. This section of rule 609 begins with a general disapproval of the use of prior juvenile adjudications. The rule qualifies its rejection of adjudications when three conditions are met: the witness against whom the adjudication is offered cannot be the accused, the adjudication must be for an offense that would be admissible if committed by an adult, and the court must also be "satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence." Utah R. Evid. 609(d).[10] We have previously stated

---

10. The full language of rule 609 states:
(a) General rule. For the purpose of attacking the credibility of a witness,
(1) evidence that a witness other than the accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and

(2) evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment.
(b) Time limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.

that "[t]heft is not a crime involving 'dishonesty or false statement' within the meaning of rule 609(a)(2)." *State v. Bruce*, 779 P.2d 646, 656 (Utah 1989) (quoting *United States v. Yeo*, 739 F.2d 385, 387 (8th Cir.1984)). Because shoplifting is neither a felony nor a crime involving dishonesty, the trial court correctly refused to allow Mr. Gonzales to cross-examine Jessica and Anjali about their prior shoplifting adjudications under rule 609.

¶ 52 Mr. Gonzales attempted to widen the spectrum of admissible juvenile adjudications beyond those permitted by rule 609(d) by invoking *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). There, the United States Supreme Court permitted a juvenile witness to be cross-examined about his past adjudications when they were demonstrably relevant to show the juvenile's bias, prejudice, or motive to lie. *Davis*, 415 U.S. at 320, 94 S.Ct. 1105. Read in the manner preferred by Mr. Gonzales, *Davis* would entirely do away with rule 609's linkage between impeachment for credibility and criminal conduct associated with dishonesty, thereby broadening the permissible use of prior juvenile adjudications beyond the use of prior convictions for adults.

¶ 53 However, as the trial court implicitly recognized, *Davis* did not revolutionize the use of juvenile adjudications as Mr. Gonzales would have us believe. There are several reasons for this. First, it is implausible to believe that by paring away a portion of the confidentiality traditionally afforded juvenile proceedings to accommodate the Sixth Amendment right to confrontation, the Supreme Court intended to bring about the incongruous result of making juvenile adjudications easier to admit than adult convictions. Although *Davis* did not set out a test to measure whether a juvenile adjudication has a nexus to bias, prejudice, or motive to lie, no mere assertion of linkage will suffice. A closer look at the *Davis* facts underscores this point.

¶ 54 The prosecution's key witness in *Davis* was a juvenile who identified Mr. Davis as the man who had committed a burglary. *Id.* at 310, 94 S.Ct. 1105. Both at the time of the offense and at the time of trial, the witness was on probation following two adjudications, both for burglary. *Id.* at 310–11, 94 S.Ct. 1105. The prosecutor sought a protective order, which the trial court granted, preventing the defense from asking the witness about the adjudications. *Id.* At trial, defense counsel's cross-examination of the witness was as follows:

Q. Were you upset at all by the fact that this safe was found on your property?

A. No, sir.

Q. Did you feel that they might in some way suspect you of this?

A. No.

Q. Did you feel uncomfortable about this though?

A. No, not really.

Q. The fact that a safe was found on your property?

A. No.

However, evidence of a conviction more than ten years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.
(c) Effect of pardon, annulment, or certificate of rehabilitation. Evidence of a conviction is not admissible under this rule if (1) the conviction has been the subject of a pardon, annulment, certificate of rehabilitation, or other equivalent procedure based on a finding of the rehabilitation of the person convicted, and that person has not been convicted of a subsequent crime which was punishable by death or imprisonment in excess of one year, or (2) the conviction has been the subject of a pardon, annulment, or other equivalent procedure based on a finding of innocence.
(d) Juvenile adjudications. Evidence of juvenile adjudications is generally not admissible under this rule. The court may, however, in a criminal case allow evidence of a juvenile adjudication of a witness other than the accused if conviction of the offense would be admissible to attack the credibility of an adult and the court is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence.
(e) Pendency of appeal. The pendency of an appeal therefrom does not render evidence of a conviction inadmissible. Evidence of the pendency of an appeal is admissible.
Utah R. Evid. 609.

Q. Did you suspect for a moment that the police might somehow think that you were involved in this?

A. I thought they might ask a few questions is all.

Q. Did that thought ever enter your mind that you—that the police might think that you were somehow connected with this?

A. No, it didn't really bother me, no.

Q. Well, but. . . .

A. I mean, you know, it didn't—it didn't come into my mind as worrying me, you know.

Q. That really wasn't—wasn't my question, Mr. Green. Did you think that—not whether it worried you so much or not, but did you feel that there was a possibility that the police might somehow think that you had something to do with this, that they might have that in their mind, not that you. . . .

A. That came across my mind, yes, sir.

Q. That did cross your mind?

A. Yes.

Q. So as I understand it you went down to the—you drove in with the police in—in their car from mile 25, Glenn Highway down to the city police station?

A. Yes, sir.

Q. And then went into the investigators' room with Investigator Gray and Investigator Weaver?

A. Yeah.

Q. And they started asking you questions about—about the incident, is that correct?

A. Yeah.

Q. Had you ever been questioned like that before by any law enforcement officers?

A. No.

*Id.* at 312–13, 94 S.Ct. 1105.

¶ 55 The Supreme Court found that the witness's answers were almost certainly untrue in light of his burglary adjudications, but were uttered without risk because the juvenile knew he was immune from questions that would require him to disclose them. *Id.* at 314, 94 S.Ct. 1105. It is easy to understand how, faced with a situation in which a key witness had uttered obvious falsehoods with impunity, the Supreme Court found its way clear to restore fairness to Mr. Davis's trial by requiring the witness to endure the full rigor of cross-examination. The Court concluded that not only was Mr. Davis deprived of an opportunity to present meaningfully his defense theory, but that, perhaps worse, the jury may have erroneously interpreted Mr. Davis's accusatory cross-examination of the witness as a gratuitous and baseless attack on his credibility. *Id.* at 317–18, 94 S.Ct. 1105.

¶ 56 The *Davis* court took pains to explain that its holding did not open the door to the use of juvenile adjudications to attack generally the credibility of a witness. For his part, even Mr. Davis acknowledged that his right to confrontation was not so potent as to overpower entirely the long standing restrictions on the admissibility of juvenile adjudications. That an adequate foundation be laid to show that a witness's testimony was the product of bias, prejudice, or a motive to lie is the essential element that must be present before the proscriptions against admitting juvenile adjudications can be overcome. Deciding the quantity and quality of foundational evidence a defendant must present before a court may admit a witness's juvenile adjudication poses a more challenging question, one that the Supreme Court did not directly answer.

¶ 57 In this case, the trial court denied Mr. Gonzales's request to allow the cross-examination under *Davis*, stating that in *Davis*, the adjudications were relevant to the matter at hand, whereas here, they were not. At the time Mr. Gonzales moved for permission to cross-examine the women about their adjudications, only opening statements had been presented. Defense counsel raised the theory that Jessica didn't want her mother to marry Mr. Gonzales and this is why she fabricated the allegation against Mr. Gonzales as grounds for permitting the cross-examination. Defense counsel did not, however, connect the women's adjudications to bias, prejudice, or motive to lie, either during opening arguments or in her argument to the trial court. In contrast to Mr. Davis, who insisted he did not wish to use the witness's juvenile adjudications simply to attack the

witness's credibility, Mr. Gonzales's only stated purpose was to make a broadside attack on Jessica and Anjali's credibility.

¶ 58 On appeal, Mr. Gonzales attempts to shore up the relevance of Jessica and Anjali's adjudications and to align his case more closely to *Davis*. He argues to us, for the first time, that both women had personal animus toward him because he allowed them to stay in detention overnight following their shoplifting arrests. Whatever foundational merit this suggestion of motive to lie may have, the details of this substantially fact-dependent issue appear nowhere in the trial record, and we decline to conduct our own evaluation of it.

¶ 59 Mr. Gonzales further argues that Jessica and Anjali's adjudications are relevant because they show that the women had motive to lie in the hopes of pleasing law enforcement and thereby receiving more favorable treatment from the State in their own cases. Mr. Gonzales thus ties the shoplifting adjudications directly to bias, and argues that he ought to be able to cross-examine the women about their adjudications in order to demonstrate the cause of their bias. We reject this argument, recognizing that the introduction of Jessica and Anjali's juvenile adjudications for this reason would invite the introduction of the adjudication of any witness who, at the time his testimony was sought, was under the supervision of the court or was in some way eligible to extract some benefit in return for testimony favorable to the prosecution. This standard would fall well short of the degree of foundation necessary to justify the admission of juvenile adjudications.

¶ 60 Mr. Gonzales couples this *Davis*-based argument to Utah Rule of Evidence 608(c), a rule not invoked until this appeal. Rule 608(c) states: "Bias, prejudice, or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by evidence otherwise adduced." Utah R. Evid. 608(c). Mr. Gonzales did not raise this issue directly at trial as a justifica-

tion for cross-examining the young women about their adjudications.[11] In fact, when the trial court sought Mr. Gonzales's authority for his position, he specifically stated that he relied on rule 609 and no other rule.

¶ 61 We reject Mr. Gonzales's argument, both as to rule 608 and *Davis*, because although he hinted at the question of bias by raising *Davis*, he failed to state any basis to believe that the women were biased against him. He did not present to the trial court any foundational evidence of bias that could be subjected to a *Davis* test. The trial court never had the opportunity to rule on the question that is now before us and ruled correctly on the question it did confront. Because Mr. Gonzales failed to preserve this claim at trial, and in the absence of a demonstration of plain error or exceptional circumstances, we do not address its merits on appeal. *State v. Labrum*, 925 P.2d 937, 939 (Utah 1996).

¶ 62 We conclude that rule 609 did not allow for the admission of cross-examination concerning the young women's shoplifting adjudications. We also conclude that Mr. Gonzales failed to preserve his rule 608 claim and to develop his *Davis* argument in a manner that would allow for the testimony to be admitted. Therefore, Mr. Gonzales's Sixth Amendment right to confrontation was not violated. We affirm the rulings of the trial court.

## IV. INEFFECTIVE ASSISTANCE

¶ 63 Next, Mr. Gonzales seeks reversal of his conviction because his trial counsel, Ms. Miller, was ineffective in two ways: first, she "opened the door" to prior bad acts, and second, she withdrew an objection to irrelevant prejudicial evidence being proffered by the State. The trial court did not address this issue directly. However, criminal defendants may raise ineffective assistance of counsel claims on direct appeal when, as here, they are represented by new counsel, and "the record is adequate." *State v. Litherland*, 2000 UT 76, ¶ 16, 12 P.3d 92. Ac-

---

11. The State argues that Mr. Gonzales failed to preserve the bias argument entirely and it is therefore waived. However, it is clear from the record that, although Mr. Gonzales stated he relied on rule 609 and had no other bases, he did raise the issues of bias by pointing to *Davis*. We address the argument, but reject it on different grounds.

cordingly, we take up the merits of this claim.

¶ 64 To test an attorney's performance, we rely on the United States Supreme Court's two-part test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):

> To prevail on an ineffective assistance of counsel claim under the Strickland test, "a defendant must show (1) that counsel's performance was so deficient as to fall below an objective standard of reasonableness and (2) that but for counsel's deficient performance there is a reasonable probability that the outcome of the trial would have been different."

*State v. Nelson–Waggoner*, 2004 UT 29, ¶ 27, 94 P.3d 186 (quoting *State v. Montoya*, 2004 UT 5, ¶ 23, 84 P.3d 1183) (other quotation marks omitted).

### A. Mr. Gonzales's Attorney Was Not Ineffective When She Opened the Door to Inadmissible Prior Bad Acts

¶ 65 Mr. Gonzales first argues that Ms. Miller was ineffective when she opened the door for questioning about past accusations made against Mr. Gonzales by Jessica. Ms. Miller asked Mr. Gonzales if he had ever been "accused" of sexual assault. He responded that he had not. On cross-examination, the State drew testimony from Mr. Gonzales that he had in fact been previously accused by Jessica of sexual assault but had never been charged with this crime.[12] On redirect examination, Ms. Miller asked if he had ever been charged or convicted of sexual assault. Mr. Gonzales argues now that by inadvertently asking if he had been accused, as opposed to limiting her question to whether or not he had been charged or convicted, Ms. Miller opened the door for the State to ask him questions about prior accusations of sexual assault, and that this line of questioning by the State severely prejudiced him and ultimately prompted the jury to convict. At the close of trial, Ms. Miller moved for a mistrial based on her own ineffectiveness.

She argued that she had erred in using the term "accused," and meant to ask only about charges or convictions. She contended that she never intended to open the door for the prosecution to ask about Jessica's previous accusations. The trial court denied the motion.

¶ 66 We review Ms. Miller's actions under *Strickland*, and conclude that her line of questioning, although possibly harmful to Mr. Gonzales, was neither objectively unreasonable nor so deficient that the outcome of the trial would have been different.

¶ 67 It is clear from the record that Ms. Miller mistakenly used the term "accused" in asking Mr. Gonzales about previous episodes involving sexual assault. She had been clear before trial that she hoped Jessica's previous accusations would not be admitted, and she was clear during a bench conference that she intended to limit her questions to past charges or convictions. Even the prosecutor admitted that Ms. Miller had inadvertently used the term "accuse."

¶ 68 This error enabled the prosecution to attack as untrue Mr. Gonzales's response that he had never been accused of sexual assault and to inquire after the details of Jessica's past accusations against him. However, we do not think the outcome would have been different but for the mistake for two reasons: first, Ms. Miller was given the opportunity to rehabilitate Mr. Gonzales to the best of her ability, and second, the evidence regarding Jessica's past accusations was not otherwise inadmissible. We address each in turn.

¶ 69 First, Ms. Miller was given the opportunity to rehabilitate Mr. Gonzales, and did so in a manner that effectively diminished the importance of the past accusations. She asked him specifically what the allegations and the outcomes of those allegations were. In his response, he stated that he and Ms. Snodgrass had discussed the accusations with Jessica, and although Jessica's accusations temporarily derailed the engagement, they had concluded she was lying and put it be-

---

12. Before doing so, the State asked for permission from the trial court to pursue this line of questioning. The State admitted that Ms. Miller had made a mistake and acknowledged that she had intended only to ask about charges and convictions. However, the State argued that it was entitled to capitalize on the error once it was made. The trial court allowed the questioning.

hind them. Twice he stated that Jessica had lied about the allegations. Although both parties assume that it was indeed harmful to Mr. Gonzales's credibility that he had previously been accused of sexual assault, he capitalized on the opportunity to attack Jessica's credibility and turned the disclosure of the accusations to his advantage by pointing out that her own mother believed she lied about the past incident.

¶ 70 Next, the evidence concerned previous wrongs or bad acts. Previous wrongs are inadmissible under rule 404(b) for the purposes of showing character, but are admissible for the purposes of showing "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Utah R. Evid. 404(b). Here, the State argues that the past accusations should have been admissible in order to show the reason that Jessica had chosen to not report the attempted rape to her mother: namely, that she had previously told her mother that Mr. Gonzales had inappropriately touched her, and her mother had not done anything about it, and for this reason, Jessica chose to disclose the rape allegation to Anjali, rather than to Ms. Snodgrass. This information was discussed during Jessica's testimony. Because the rules of evidence would not prevent Jessica from discussing these matters, any harm done to Mr. Gonzales's testimony is mitigated by the fact that it might have arisen anyway.

¶ 71 We conclude that although Ms. Miller may have asked an unintended question, any harm done would not have changed the outcome of the trial. The evidence was likely admissible in any event and Ms. Miller effectively rehabilitated Mr. Gonzales. We therefore reject Mr. Gonzales's claim of ineffective assistance of counsel relating to this incident.

*B. Mr. Gonzales's Attorney Was Not Ineffective When She Withdrew Her Objection to Irrelevant Prejudicial Evidence*

¶ 72 Mr. Gonzales next argues that Ms. Miller rendered ineffective assistance when she withdrew her objection to the State's introduction of evidence that Mr. Gonzales was in arrears on his child support payments. He argues that this information was not relevant and was unfairly prejudicial.

In analyzing a defendant's complaints about counsel, this Court usually gives great deference to counsel's trial decisions, and mistakes in trial strategy or tactics do not render counsel's performance ineffective. Generally, an attorney's performance will be held ineffective only when there is no tactical or strategic justification for his conduct of the trial.

*State v. Colonna,* 766 P.2d 1062, 1066 (Utah 1988). "[I]n making such an analysis, this court will not second-guess trial counsel's legitimate strategic choices." *State v. Callahan,* 866 P.2d 590, 593 (Utah 1993) (internal citation omitted). Here, Ms. Miller objected to the statement regarding child support arrears on the basis of lack of foundation. After being provided with a document by the State, she withdrew her objection and did not renew it based on any other grounds. Because Ms. Miller may have felt that the objection was futile and chose not to object for strategic reasons (such as not drawing attention to this unfortunate information), we will not question her strategy.

¶ 73 The second prong of the *Strickland* test requires Mr. Gonzales to show that but for the action, the results of the proceedings would have been different. Although Mr. Gonzales has suggested to us that his credibility was harmed by the introduction of this evidence, he has been unable to convince us that but for these mistakes, the jury would have reached a different result.

## V. CUMULATIVE ERROR

¶ 74 Mr. Gonzales finally argues that all the errors in this case cumulatively warrant reversal under the cumulative error doctrine. "Under the cumulative error doctrine, we will reverse only if 'the cumulative effect of the several errors undermines our confidence ... that a fair trial was had.'" *State v. Kohl,* 2000 UT 35, ¶ 25, 999 P.2d 7 (quoting *State v. Dunn,* 850 P.2d 1201, 1229 (Utah 1993)). If the claims are found on appeal to not constitute error, or the errors are found to be so minor as to result in no harm, the doctrine will not be applied. *Id.* at ¶ 15. The cumulative error doctrine does not

apply to this case. We affirm the rulings of the trial court and thus conclude that there are no errors warranting reversal.

## CONCLUSION

¶ 75 In conclusion, we affirm the trial court's rulings that Mr. Gonzales's subpoena of Jessica's mental health records from UNI should be quashed and that Mr. Gonzales was not entitled to cross-examine Jessica and Anjali about their previous juvenile adjudications. The issue of choice of counsel is moot because Mr. Montgomery voluntarily withdrew as Mr. Gonzales's counsel. We also conclude that Ms. Miller's assistance, although containing errors, was not harmful and thus was not ineffective. Finally, we conclude that the errors Mr. Gonzales alleges occurred in this case do not amount to a cumulative error requiring reversal.

¶ 76 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING's opinion.