2013 UT 70

**STATE of Utah, Plaintiff and Appellee,**

v.

**Michael David LARRABEE, Defendant and Appellant.**

**No. 20110739.**

Supreme Court of Utah.

Nov. 22, 2013.

---

John E. Swallow, Att'y Gen., Jeffrey S. Gray, Asst. Att'y Gen., Salt Lake City, for appellee.

Linda M. Jones, Noella A. Sudbury, Salt Lake City, for appellant.

Chief Justice DURRANT authored the opinion of the Court, in which Justice DURHAM, Justice PARRISH, and Judge ORME joined.

Chief Justice DURRANT, opinion of the Court:

## INTRODUCTION

¶ 1 Michael D. Larrabee (Defendant) appeals three criminal convictions: two for ag-

gravated sexual abuse of a child, and one for dealing in material harmful to a minor. Defendant argues that the convictions cannot stand because (1) the evidence used to convict him was inherently improbable; (2) the trial court committed reversible error when it excluded expert testimony regarding Defendant's lack of pedophilic interests under rules 702 and 403 of the Utah Rules of Evidence; and (3) the prosecutor prejudiced the jury by making several improper remarks during closing arguments.

¶ 2 After careful review of the record, we conclude that Defendant failed to preserve the issue of prosecutorial misconduct for appeal. Nevertheless, we hold that defense counsel's failure to object to the prosecutor's conduct at trial constitutes ineffective assistance of counsel. We therefore remand this case to the trial court for a new trial on all counts.[1]

## BACKGROUND

¶ 3 Defendant married Jan in 1991. At that time, Jan had a twelve-year-old daughter, Jamie, from a prior marriage, who refused to accept Defendant into the family. As Jamie matured, she became a source of friction in the Larrabee home: she was taken into police custody as early as age 13, abused drugs and alcohol, and was in and out of correctional and rehabilitation facilities for several years.

¶ 4 In 1996, Jamie gave birth to her first child, A.B., while in state custody. The following year she gave birth to B.B., and then in 1998 she gave birth to another son, T.B. Initially, B.B. and T.B. lived with their biological father, but in 1999 Jan and Defendant petitioned to become the guardians of A.B., alleging that due to her lifestyle, Jamie was unable to care for him. Jamie subsequently gave birth to two more children, and Jan and Defendant ultimately became the guardians of all five. Jamie resented Jan and Defendant, however, and threatened to take the children back from them.

¶ 5 The Larrabees settled in Kaysville in 2004. In 2005, Jamie was released from prison and came to live with the Larrabees, where her behavior once again became a source of tension in the home. Eventually, Defendant informed Jan that he could no longer tolerate Jamie's behavior and asked her to choose between Jamie and him. Defendant and Jan subsequently separated and were divorced in October 2005. Jan and Jamie then took the children and moved to St. George, while Defendant settled in Las Vegas.

¶ 6 As part of the divorce decree, Defendant was awarded visitation rights with the children every other weekend. By all accounts, Defendant exercised these rights regularly between 2005 and 2008. When he would visit, Defendant would take the children to various hotels in St. George where they would swim, watch movies, play games, shop, and go out to eat. All of the children looked forward to these visits because, as B.B. testified, "[i]t was fun."

¶ 7 After Defendant moved to Idaho his visits became less frequent, and his last visit with the children was in August 2008. Later that year, Jamie noticed that four-year old M.V., her youngest daughter, was playing with naked Barbie dolls and moving them on top of each other. When she asked M.V. what the dolls were doing, M.V. replied that they were playing "kiss and suck." Jamie asked M.V. whether anyone had touched her inappropriately, but M.V. did not respond.

¶ 8 Then, in January 2009, Jamie once again noticed that M.V. and a friend were playing with naked Barbie dolls. Jamie sent the friend home and informed M.V. that "Barbies don't play [like] that." She then talked to M.V. about "good touch, bad touch" and asked M.V. "if anyone had ever touched her ... in those areas." Initially, M.V. did not respond, but later she came out of her room and stated: "Mommy, I know who touched my pee pee. It was Grandpa Mike." Jamie then approached B.B. and asked her whether Defendant had touched her inappropriately. She indicated that he had. The very next day, Jamie spoke with police and the State ultimately filed charges based upon B.B.'s testimony that Defendant had sexually

---

1. Because we conclude that Defendant is entitled to a new trial on all counts due to ineffective assistance of counsel, we decline to address Defendant's other arguments in this opinion.

abused her repeatedly during his visits with the children in St. George and that he had intentionally shown her pornography.

¶ 9 B.B. had three opportunities to explain her allegations against Defendant: (1) in an interview with the Children's Justice Center (CJC), which was recorded and later admitted as evidence at trial; (2) at the preliminary hearing; and (3) at trial. Her allegations involved four general areas of sexual conduct. First, she testified that when she was five or six and the Larrabees were still living in Kaysville, Defendant took her into the bedroom one afternoon and had her pose nude while he took pictures of her.[2] Second, she testified that when Defendant would come to St. George to visit, he would usually rent adjoining hotel rooms, one for the boys and one for the girls, and that "most every night" while M.V. was asleep and the boys were in their room, Defendant would lock the doors and molest her by touching her bottom, rubbing her genitals, and performing oral sex on her. B.B. also alleged that Defendant would occasionally have her touch his penis with her hand. Third, B.B. testified that she had seen Defendant molesting M.V. in a hotel room through a sliding glass door and that Defendant would also molest M.V. at night. Finally, B.B. testified that Defendant would consistently bring pornographic videos and magazines with him into the hotels, and that he would view these materials while B.B. was in the room, sometimes commenting to her about the quality of what they were viewing together.

¶ 10 Based on this testimony, the state charged Defendant with three counts of aggravated sexual abuse of a child (two for B.B., one for M.V.) and one count of dealing in materials harmful to a minor. At trial, Defendant testified in his own defense. He denied all of the allegations, described the difficult and combative relationship he had with Jan and Jamie, and testified that he "loved and cared for" the children. The state then tried to introduce evidence that Defendant had sexually molested Jamie, but, after excusing the jury, the trial court ruled that her testimony was inadmissible due to unreliability and instructed both Jamie and counsel not to refer to these new allegations in the presence of the jury. Nevertheless, despite the trial court's warning that reference to these allegations would lead to a mistrial, during closing arguments the prosecutor did refer to Jamie's allegations of sexual abuse. Neither defense counsel nor the court intervened, however, and Defendant was eventually convicted on the two counts of aggravated sexual abuse regarding B.B., the count of dealing in material harmful to a minor, but he was acquitted on the count of aggravated sexual abuse regarding M.V.

¶ 11 After trial, Defendant filed a motion to arrest judgment pursuant to rule 23 of the Utah Rules of Criminal Procedure, wherein he raised the same arguments he raises in this appeal, namely that the evidence used to convict him was inherently improbable; that the trial court erred by excluding expert testimony; and that the prosecutor's conduct during closing arguments was prejudicial. The district court denied Defendant's motion and upheld the convictions. Defendant now appeals. We have jurisdiction over this matter pursuant to Utah Code section 78A–3–102(3)(i).

## ANALYSIS

¶ 12 We first address the question of whether Defendant's motion to arrest judgment served to preserve his claim for prosecutorial misconduct for appeal. Defendant argues that the motion, by itself, was sufficient to preserve the issue. For the reasons stated below, we disagree.

¶ 13 Defendant also argues that defense counsel's reaction to the prosecutor's conduct at trial was ineffective. In this respect, we agree. Accordingly, we remand this case to the trial court for a new trial on all counts.

## I. DEFENDANT'S MOTION TO ARREST JUDGMENT WAS NOT SUFFICIENT TO PRESERVE THE ISSUE OF PROSECUTORIAL MISCONDUCT FOR APPEAL

¶ 14 We turn first to the issue of preservation. Defendant argues that he

---

**2.** The state did not file any charges based upon these allegations.

properly preserved his claim for prosecutorial misconduct because he raised it in his motion to arrest judgment. We disagree.

¶ 15 "We have consistently held that a defendant who fails to preserve an objection at trial will not be able to raise that objection on appeal unless he is able to demonstrate either plain error or exceptional circumstances."[3] And with respect to appellate review of closing arguments, we have previously held that we "will not examine the State's closing argument if the defendant failed to timely object to it."[4] The reason behind this "preservation rule" is two-fold. First, the rule affords the trial court "an opportunity to address the claimed error, and if appropriate, correct it,"[5] thereby promoting judicial economy. And second, the rule prevents defendants from foregoing an objection "with the strategy of enhancing the defendant's chances of acquittal and then, if that strategy fails ... claiming on appeal that the [c]ourt should reverse,"[6] thereby encouraging fairness. In order to further both policies through this rule, "we have held that the preservation rule applies to *every*

claim, including constitutional questions, unless a defendant can demonstrate that exceptional circumstances exist or plain error occurred."[7]

¶ 16 Defendant's motion to arrest judgment was filed almost two months after the trial concluded, which hardly counts as a "timely objection" to the statements made by the prosecutor during closing arguments. Furthermore, allowing defendants to preserve issues like prosecutorial misconduct through motions to arrest judgment would directly contradict the purposes of the preservation rule articulated above. That is, if a motion to arrest judgment was sufficient to preserve this issue, then not only would the trial court be deprived of the opportunity to address the issue at trial, but defendants could also strategically forgo an objection without the risk that by so doing they might lose their ability to appeal that particular issue. Therefore, because Defendant's counsel failed to timely object to the statements that Defendant now contests as improper, we hold that the prosecutorial misconduct issue was not properly preserved.[8] Nevertheless,

---

3. *State v. King*, 2006 UT 3, ¶ 13, 131 P.3d 202.

4. *State v. Nelson–Waggoner*, 2004 UT 29, ¶ 30, 94 P.3d 186.

5. *Patterson v. Patterson*, 2011 UT 68, ¶ 15, 266 P.3d 828 (internal quotation marks omitted).

6. *King*, 2006 UT 3, ¶ 13, 131 P.3d 202 (alterations in original) (internal quotation marks omitted).

7. *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346 (emphasis added).

8. Despite its agreement with our holding that Defendant's motion to arrest judgment was insufficient to preserve the issue of prosecutorial misconduct for appeal, *infra* ¶ 44, the dissent nevertheless reaches the issue and employs this case as a vehicle for urging our repudiation of the doctrine of prosecutorial misconduct. *See infra* ¶¶ 63–80. Because the issue was not preserved, we decline to engage in this debate. *See Summit Water Distrib. Co. v. Summit Cnty.*, 2005 UT 73, ¶ 50, 123 P.3d 437 (observing that "[o]ur settled policy is to avoid giving advisory opinions in regard to issues unnecessary to the resolution of the claims before us").

Suffice it to say that we are not inclined to abandon our longstanding endorsement of this doctrine, a position shared by courts throughout the country, in favor of the novel notion that we have no authority to review the actions of prosecutors directly and reverse for misconduct when necessary. *See, e.g., State v. Ross*, 2007 UT 89, ¶ 54, 174 P.3d 628 (setting forth the "test" for "prosecutorial misconduct" as follows: "The test of whether the remarks made by counsel are so objectionable as to merit a reversal in a criminal case is, did the remarks call to the attention of the jurors matters which they would not be justified in considering in determining their verdict, and were they, under the circumstances of the particular case, probably influenced by those remarks" (quoting *State v. Valdez*, 30 Utah 2d 54, 513 P.2d 422, 426 (1973))); *State v. Calliham*, 2002 UT 86, ¶ 61, 55 P.3d 573 (stating that "[w]e will reverse a jury verdict because of prosecutorial misconduct if we find the prosecutor's remarks were improper and harmful to defendant" and collecting cases in support of this doctrine); *State v. Hopkins*, 782 P.2d 475, 478 (Utah 1989) (stating and applying the *Valdez* test); *State v. Troy*, 688 P.2d 483, 486 (Utah 1984) (applying the *Valdez* test); *State v. Johnson*, 663 P.2d 48, 51 (Utah 1983) (applying the *Valdez* test and noting that "the prosecutor's conduct was improper, and would have constituted grounds for a new trial if we had not reversed these convictions for insufficiency of the evidence"), *overruled on other grounds by State v. Roberts*, 711 P.2d 235, 239 (Utah 1985); *State v. Creviston*, 646 P.2d 750, 754 (Utah 1982) (applying the *Valdez* test). For opinions from other jurisdictions see, for example, *State v. Hughes*, 193 Ariz. 72, 969

Defendant correctly argues that the prosecutor's conduct is still relevant to our analysis of his ineffective assistance of counsel claim,[9] to which we now turn.

## II. DEFENSE COUNSEL'S FAILURE TO INTERVENE IN RESPONSE TO THE PROSECUTOR'S CONDUCT CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 17 Defendant argues that his convictions should be overturned because defense counsel's failure to object to the prosecutor's conduct during closing arguments constitutes ineffective assistance of counsel. For the reasons stated below, we agree.

■ ¶ 18 We have repeatedly classified the burden that defendants bear when asserting an ineffective assistance of counsel claim as a "heavy" one.[10] This is so because under the standard set forth in *Strickland v. Washington*,[11] the defendant must prove both of the following: "(1) that counsel's performance was so deficient as to fall below an objective standard of reasonableness and (2) that but for counsel's deficient performance there is a reasonable probability that the outcome of the trial would have been different." [12]

■ ¶ 19 Furthermore, it is important to note that *Strickland* imposes two additional presumptions *in favor* of the objective reasonableness of defense counsel's performance.[13] First, "[g]enerally speaking, [t]here is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." [14] In other words, "the general presumption of objective reasonableness requires a petitioner to 'overcome the presumption that, under [all] the circumstances, the challenged action *might* be considered sound trial strategy.' " [15] Sec-

9. *Nelson–Waggoner*, 2004 UT 29, ¶ 30, 94 P.3d 186 (stating that the State's closing argument is generally unreviewable absent objection, unless "the defendant states that the failure to object was due to ineffective assistance of counsel").

10. *See, e.g., State v. Lenkart*, 2011 UT 27, ¶ 25, 262 P.3d 1.

11. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

12. *State v. Nelson–Waggoner*, 2004 UT 29, ¶ 27, 94 P.3d 186 (internal quotation marks omitted).

13. 466 U.S. at 689, 104 S.Ct. 2052 (stating that defendants must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy" (internal quotation marks omitted)). This presumption in favor of objective reasonableness has been adopted and applied widely. *See, e.g., Bullock v. Carver*, 297 F.3d 1036, 1046–48 (10th Cir.2002) (discussing the presumption imposed by *Strickland* and collecting cases).

14. *Bullock*, 297 F.3d at 1046 (second alteration in original) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052) (internal quotation marks omitted).

15. *Id.* (alteration added) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (internal quotation marks omitted)); *see also* WAYNE R. LaFAVE ET. AL, CRIMINAL PROCEDURE § 11.10(c) (3d ed.2007) (explaining that *Strickland* "places upon the defendant the burden of showing that counsel's action or inaction was not based on a valid strategic choice").

P.2d 1184, 1192 (1998) (reviewing for prosecutorial misconduct with a focus on whether the misconduct "affected the proceedings in such a way as to deny the defendant a fair trial"); *State v. Spencer*, 275 Conn. 171, 881 A.2d 209, 221 (2005) (recognizing an "inherent supervisory authority" to reverse due to prosecutorial misconduct (internal quotation marks omitted)); *State v. Maluia*, 107 Hawai'i 20, 108 P.3d 974, 980 (2005) (observing that "where the [prosecutor's] improper conduct is so egregious that the defendant was denied her or his right to a fair trial, we reverse the defendant's conviction"); *State v. Simmons*, 292 Kan. 406, 254 P.3d 97, 99 (2011) (reversing and remanding because "prosecutorial misconduct denied [the defendant] a fair trial"); *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky.2006) (recognizing authority to reverse "only if the prosecutorial misconduct was so improper, prejudicial, and egregious as to have undermined the overall fairness of the proceedings"); *State v. Mayhorn*, 720 N.W.2d 776, 779–80 (Minn.2006) (reversing a conviction because "the cumulative effect of prosecutorial misconduct and evidentiary errors deprived [the defendant] of a fair trial"); *McBride v. State*, 934 So.2d 1033, 1038 (Miss.Ct.App.2006) ("Where prosecutorial misconduct endangers the fairness of the trial and the impartial administration of justice, we must reverse." (citing *Acevedo v. State*, 467 So.2d 220, 226 (Miss.1985))); *Valdez v. State*, 124 Nev. 1172, 196 P.3d 465, 477 (2008) (recognizing the authority to reverse for prosecutorial misconduct when "the misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process" (internal quotation marks omitted)); *State v. Smith*, 599 N.W.2d 344, 353 (S.D.1999) ("We will reverse only if the violation has prejudiced the party or denied the party a fair trial.").

ond, if it can be shown that "after thorough investigation of law and facts relevant to plausible options" counsel made a "strategic choice[ ]," then that choice is "virtually unchallengeable."[16]

¶ 20 In this case, neither party has argued that defense counsel's decision not to object to the prosecutor's comments during closing arguments was the result of a "strategic choice made after thorough investigation of law and facts," and thus the second presumption does not apply here. Instead, the State argues that defense counsel's decision *"might* be considered sound trial strategy." We disagree. Given the extremely prejudicial nature of the remarks and "under the circumstances" of this case, we conclude that counsel's choice not to object was not a "sound trial strategy." Additionally, in light of the improper, inflammatory, and prejudicial nature of the comments, we hold that defense counsel's failure to object also falls below *Strickland*'s objective standard of reasonableness and that it was reasonably likely the outcome of the trial would have been different but for defense counsel's performance. Therefore, we conclude that the *Strickland* requirements have been met here and that Defendant is entitled to a new trial on all counts due to his counsel's ineffective assistance.

### A. Defense Counsel's Performance Fell Below Strickland's Objective Standard of Reasonableness

■ ¶ 21 During trial, the State attempted to call Jamie, B.B.'s mother, as a witness to testify about how Defendant had molested her when she was eleven years old. At the suggestion of defense counsel, the trial court heard this testimony outside the presence of the jury and ruled that Jamie's testimony was inadmissible due to unreliability. The trial court then instructed both Jamie and counsel not to refer to these allegations. But despite the trial court's warning that any reference to these allegations would lead to a mistrial, during closing arguments the prosecutor made the following remarks, which, Defendant argues, were improper:

(1) When he's dragging [B.B.'s mother] back to the house in Arizona, how come she doesn't scream and say look what he's doing to me? He's sexually abusing me. He's doing all these things. Why didn't she come out herself and say [Defendant's] doing these terrible things to me? Why didn't she have that vengeance then? Why does she wait until she's not in his life at all?

(2) Well, ladies and gentlemen of the jury, [Defendant] is consistent. He's given one statement to you. One statement. [B.B.] has given three statements … [a]nd therefore, this [defense] attorney gets a chance to beat up on her. [Defendant] has given one statement the entire time. He's been preparing for [his testimony yesterday] to tell you ["I] didn't do [it."] Consistent with what? We don't have any other statement from [Defendant]. What are we supposed to compare it to?

Because we reverse based on the first statement (Contested Statement), we find it unnecessary to reach the question of whether the second also warrants reversal.

¶ 22 The State argues that defense counsel might not have objected to the Contested Statement because he feared that it would highlight its prejudicial nature. The State also argues that this qualified as a "sound" strategy. But given the obvious impropriety of the Contested Statement, as well as its inflammatory and prejudicial nature, under the facts of this case we cannot agree and therefore refuse to recognize such a strategy as "sound." Accordingly, we conclude that the first *Strickland* presumption is overcome. We further conclude that because it was unreasonable for defense counsel not to object, his performance fell below *Strickland*'s objective standard of reasonableness.

### 1. It Should Have Been Clear to Defense Counsel that the Contested Statement Was Improper and Inflammatory

¶ 23 The fact that the Contested Statement was improper and inflammatory should have been immediately apparent to defense counsel. The first remark was, of course, the

**16.** *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052.

more damaging of the two because it explicitly referred to allegations of child sexual abuse that the trial court had previously ruled inadmissible. Specifically, the prosecutor referred to allegations brought by B.B.'s mother that Defendant had sexually abused her many years prior to the events at issue in this case. This was improper for a number of reasons. First, "[t]he Utah Rules of Professional Conduct ... prohibit an attorney from alluding to matters not introduced as evidence at trial." [17] Second, when a prosecutor insinuates "that other evidence exists [he] encourages the jury to determine its verdict based upon evidence outside the record and jeopardizes a defendant's right to a trial based upon the evidence presented." [18] And finally, by referring to these allegations, the prosecutor "demonstrated a complete disregard for the tribunal's rulings." [19]

¶ 24 We agree with Defendant that the Contested Statement was improper because a prosecutor may not "assert arguments he knows to be inaccurate," [20] especially when those arguments refer to evidence not in the record [21] or evidence that has been excluded by the trial court.[22] Therefore, we conclude that the improper nature of the prosecutor's comments should have been obvious to defense counsel.

¶ 25 In addition to recognizing their impropriety, defense counsel should have also recognized that the Contested Statement was inflammatory. Within the context of a criminal trial for the sexual abuse of a child, it is difficult to conceive of a more inflammatory statement than that offered by the prosecutor—namely, that Defendant had a prior history of child sex abuse.[23] This is especially true in this case, where the jury had, to that point, heard absolutely nothing regarding such a prior offense. For these reasons, defense counsel should have been immediately aware that these comments were both improper and inflammatory.

2. Under All the Circumstances of this Case, No Sound Trial Strategy Would Condone Defense Counsel's Decision to Remain Silent, and Counsel's Decision to Do So Falls Below *Strickland*'s Objective Standard of Reasonableness

¶ 26 Given the circumstances of this case as outlined above, we are at a loss to conceive of a "sound trial strategy" [24] that would justify defense counsel's decision to remain completely silent while the prosecutor made the Contested Statement. In the face of such obviously improper and inflammatory comments, defense counsel should have immediately objected and moved for a mistrial or, at the very least, demanded a curative instruction. But by failing to do so, not only did defense counsel fail to address the prejudice elicited by the Contested Statement, but he also failed to preserve the issue for ap-

17. *State v. Young*, 853 P.2d 327, 349 (Utah 1993) (citing Utah Rules of Prof'l Conduct R. 3.4(e)).

18. *Id.* (citing *United States v. Young*, 470 U.S. 1, 18, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)).

19. *State v. Span*, 819 P.2d 329, 334 (Utah 1991) (internal quotation marks omitted).

20. *State v. Williams*, 656 P.2d 450, 454 (Utah 1982).

21. *Young*, 853 P.2d at 349.

22. *Span*, 819 P.2d at 334.

23. The dissent posits that the Contested Statement might have been viewed by the jury as "a mere hypothetical" and then asserts that its impact "in this context" was "relatively minor." *Infra* ¶ 46. But as stated above, within the context of a criminal trial for the sexual abuse of a child, we can think of nothing more prejudicial than a bald accusation that the defendant has a history of child sex abuse. And contrary to the dissent's belief that this remark was "vague" or "hypothetical," we note that the prosecutor did not use any language typically seen in vague, "merely hypothetical" statements, such as "if" or "had." Instead, the prosecutor used the words "when," "doing," and "he is," all of which imply that what is being described is *fact*, not fiction. And since the jury had heard nothing of these allegations prior to the prosecutor's remark, and since, as noted above, this case turned entirely on the jury's evaluation of Defendant's credibility, we find it hard to believe that the impact of these statements during the jury's deliberations would have been "relatively minor." For the jury to have been confronted, out of the blue and at the conclusion of the trial, with the allegation that Defendant had engaged in prior child sexual abuse had to have been shocking to them.

24. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (internal quotation marks omitted).

peal.[25] And in our view these failures are sufficiently egregious to support the conclusions that defense counsel's decision cannot be considered to be a "sound trial strategy," as required by *Strickland*, and that defense counsel's performance fell below *Strickland*'s objective standard of reasonableness.

¶ 27 The State attempts to counter this line of argument by asserting that defense counsel's decision to remain silent *does* qualify as a "sound" trial strategy because counsel may have feared that an objection or motion might highlight or compound the prejudicial nature of the Contested Statement for the jury.[26] The dissent agrees and goes to great lengths to make the point that, under certain circumstances, strategically refusing to object is an acceptable trial strategy.[27] But here we are not disputing the fact that there are times when counsel's decision not to object can be both strategic and proper. That proposition is axiomatic. We simply conclude that this was not one of those times.

¶ 28 As the dissent acknowledges, "[t]he question of where to draw the line—of when to object and when to stand pat—is . . . difficult."[28] And under the circumstances of this case, we are simply drawing this line in a different place than that advocated by the dissent. We believe that, given the improper and inflammatory nature of the prosecutor's remarks, it was not reasonable for defense counsel to stand silent. Thus, contrary to what is asserted by the dissent, we are not departing from *Strickland*, we are applying it.[29] And while we recognize that it can be a legitimate strategy to remain silent due to a fear of prejudice, under the facts of this case such a strategy does not qualify as "reasonable" or "sound," since no more prejudicial accusation can be made within the context of a child sex abuse case than that the defendant has a history of sexually abusing children, which is precisely the accusation the prosecutor made here. Within the context of this case, therefore, we decline to assume, as the State and dissent urge us to do, that defense counsel failed to object because he had made a reasonable and sound strategic decision. Instead, we conclude that, given the nature of the Contested Statement, such a strategy was patently *unreasonable*.

¶ 29 This conclusion stems from the inflammatory and prejudicial nature of the Contested Statement itself. As outlined above, prior to the prosecutor's closing argument, no evidence of any kind had been

---

25. We note that, where misconduct is concerned, defense counsel would have had to both object *and* move for a mistrial or request a curative instruction before the issue would have been preserved. *See, e.g.,* Robert J. Martineau et al., Appellate Practice & Procedure, Cases & Materials 101 (2d ed. 2005) ("[T]he cases are legion in holding that if an appellant objects and the objection is sustained but he does not move for a curative instruction or request a mistrial, he has received what he asked for and cannot be heard to complain on appeal.").

26. We have previously held that such strategic decisions do not give rise to a claim for ineffective assistance of counsel. *See, e.g., State v. Ott,* 2010 UT 1, ¶ 34, 247 P.3d 344 (observing that "whenever there is a legitimate exercise of professional judgment in the choice of trial strategy, the fact that it did not produce the expected result does not constitute ineffectiveness of counsel" (internal quotation marks omitted)); *see also State v. Harter,* 2007 UT App 5, ¶ 16, 155 P.3d 116 (finding strategic decision in failure of defense counsel to argue for curative jury instruction on implication of defendant's flight because defense counsel did not want to emphasize the fact that defendant fled the scene of the crime).

27. *See infra* ¶¶ 48–49.

28. *Infra,* ¶ 56.

29. The dissent characterizes our opinion as one that is "unfaithful" to *Strickland (infra* ¶ 41) when, in fact, it falls squarely within *Strickland's* analytical framework. Our conclusion, reduced to its simplest terms, is this: in failing to object to the prosecutor's improper, explicit reference to past child sexual abuse by Defendant, defense counsel's performance fell below *Strickland's* objective standard of reasonableness. And the dissent's position, reduced to its simplest terms, is this: it was a reasonable strategic decision for defense counsel not to object to the prosecutor's statement, even in a child sexual abuse case where only the Defendant's and the victim's credibility was at issue. The dissent's principal argument in favor of this conclusion is that such a strategy was reasonable because defense counsel may have feared highlighting the reference to past sexual abuse, as if absent such an objection this highly inflammatory reference might have slipped by the jury unnoticed. In our view, if failing to object to the allegations made by the prosecutor in this case does not rise to the level of ineffective assistance of counsel, then it is difficult to conceive of what might.

offered in support of the idea that Defendant had a history of child sex abuse. Then, the jury was blindsided by that very accusation, which, for the reasons articulated above, was both improper and inflammatory. Contrary to what is asserted by the dissent and the State, under these circumstances it would be *unreasonable* for counsel to fear highlighting those comments by objecting because they were already brightly highlighted by their very nature. Allegations of past sexual abuse of a child do not pass by unnoticed, particularly within the context of a criminal trial for that very crime. They shout their presence. An objection simply would not have highlighted the Contested Statement any more significantly than it already was. Failing to object under these circumstances, therefore, cannot qualify as a "sound" trial strategy.

¶ 30 Furthermore, if we were to accept the State's argument that defense counsel's failure to object (based on a "fear of highlighting") qualified as a sound trial strategy in this case, it is difficult to conceive of many cases where such a strategy would not be available to the State to preclude an ineffective assistance claim. As we have noted, the prosecutor's violation of the judge's order was so brazen and the accusation so obviously inflammatory that it had already been brightly highlighted by its very nature. As a result, we consider it to be clear in this case that the State's "fear of highlighting" argument fails to defeat Defendant's ineffective assistance claim.

¶ 31 But we think it important to note that, even in closer cases, the "fear of highlighting" argument should be analyzed with some skepticism. For at bottom, when accepted, it permits the State to engage in improper conduct without consequence. It insulates the State from objection to its misconduct by the very fact that an objection might render that misconduct even more effective by bolstering the State's case. Further, in those cases where defense counsel fails to object to improper comments by the State, the imputation of a "fear of highlighting" argument will almost always be available to the State. And were that argument too readily accepted, it would significantly undermine our ineffective assistance of counsel doctrine.

■ ¶ 32 Finally, the "fear of highlighting" argument also puts defense counsel at a significant disadvantage at trial. She faces a Hobson's choice: on the one hand, if she objects, she risks highlighting the improper comment. If she does not, she is effectively barred from raising the issue on appeal because her silence may be deemed a "sound" strategy. Thus, if the argument is too readily accepted, it could stand as a substantial obstacle to a fair trial. This is not to say it should never be accepted. Our rules of preservation are critical to the appellate process and are themselves an important mechanism for promoting fairness. It is only to say that it is an argument that always warrants careful scrutiny, with the inequities we have noted in mind.[30]

¶ 33 For the foregoing reasons, we conclude that defense counsel's decision not to object cannot, under all of the circumstances of this case, qualify as a "sound trial strategy." Therefore, we conclude that *Strickland*'s first presumption is overcome. And because it was unreasonable for counsel not to object, we also conclude that counsel's performance fell below the objective standard of reasonableness set forth in *Strickland*.

B. *"But For" Defense Counsel's Performance, There Was a Reasonable Probability that the Outcome of the Trial Would Have Been Different*

■ ¶ 34 We now turn to *Strickland*'s second requirement, under which the defendant must show that "but for counsel's deficient

---

**30.** This case provides a perfect example of an inadequate "fear of highlighting" argument. Here, the State attempted to impute to defense counsel the strategy of failing to object due to a fear of highlighting in a single sentence of its brief, without any argument regarding the reasonableness of such a strategy (other than the conclusory assertion that this was a legitimate strategy), or any analysis of the facts. While we recognize that the burden of proving ineffectiveness rests on the defendant, *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, in our view, "the mere incantation of strategy does not insulate attorney behavior from review." *Fisher v. Gibson*, 282 F.3d 1283, 1296 (10th Cir.2002) (internal quotation marks omitted).

performance there is a reasonable probability that the outcome of the trial would have been different."[31] The Supreme Court has defined "reasonable probability" as "a probability sufficient to undermine [our] confidence in the outcome."[32] Defendant argues that this requirement is met here because, in addition to the improper and inflammatory nature of the Contested Statement discussed above, it was also highly prejudicial. We agree.

¶ 35 In this case, the jury was being asked to render a verdict based solely on its assessment of the credibility of two witnesses: Defendant and B.B. There was no physical, direct, or even circumstantial evidence corroborating B.B.'s allegations. It was simply her accusations pitted against Defendant's denials. We also find it significant that the prosecutor presented no evidence (other than his improper remarks during closing arguments) that undermined Defendant's credibility. Instead, numerous witnesses—including Jan, Defendant's ex-wife and B.B.'s grandmother—testified that it was "not in [Defendant's] nature" to do this, that Defendant was "a loving ... protector of young people," and that the kids "loved [him]," "adored [him]," and "jumped on his lap and his knee."

¶ 36 Given these circumstances, it should have been obvious to defense counsel that the prosecutor's comments were highly prejudicial since they went to the heart of what the jury was being asked to decide: whether Defendant's testimony was credible. But by making the Contested Statement, the prosecutor (a) improperly referred to excluded evidence and (b) implied that Defendant had committed sexual abuse previously. Given these factors, the prejudicial nature of these remarks should have been readily apparent to defense counsel and should have motivated him to object and demand a curative instruction or a mistrial.

¶ 37 But because defense counsel failed to do so, we conclude that—given the improper, inflammatory, and highly prejudicial nature of the Contested Statement—it most likely

influenced the jury's deliberations. There was a "reasonable probability that ... the result of the [trial] would have been different,"[33] and our confidence in the jury's verdict is undermined. Accordingly, we conclude that both of the requirements set forth in *Strickland* are met here and that Defendant is entitled to a new trial on all counts due to ineffective assistance of counsel.

## CONCLUSION

¶ 38 We hold that Defendant's motion to arrest judgment was not sufficient to preserve his arguments based on prosecutorial misconduct for appeal. Nevertheless, we hold that defense counsel's failure to do anything in response to the prosecutor's conduct constitutes ineffective assistance of counsel. We therefore vacate Defendant's convictions and remand this case to the trial court for a new trial on all counts.

Justice LEE filed a dissenting opinion.

Having recused himself, Associate Chief Justice NEHRING does not participate herein; Court of Appeals Judge GREGORY K. ORME sat.

Justice LEE, dissenting:

¶ 39 I share some of the majority's discomfort with statements made by the prosecutor during closing argument. The prosecutor's allusion to abuse of the victim's mother seems to have run afoul of the district court's *in limine* ruling. But defense counsel made no objection to these statements. And because the lack of an objection could easily have been strategic (to avoid highlighting, or turning vague allusions into significant issues), I find no room in the deferential *Strickland* standard for reversal on ineffective assistance of counsel grounds.

¶ 40 The majority does not appear to challenge this premise (of a strategic basis for defense counsel's silence). But it concludes that counsel's strategic basis was not a sound one given the "extremely prejudicial nature"

---

31. *Nelson–Waggoner*, 2004 UT 29, ¶ 27, 94 P.3d 186 (internal quotation marks omitted).

32. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

33. *State v. Templin*, 805 P.2d 182, 187 (Utah 1990) (internal quotation marks omitted).

of the prosecutor's remarks. *Supra* ¶ 20. And it offers a number of grounds for avoiding the usual implication of a strategic basis for the lack of an objection by trial counsel (which is the failure of the ineffective assistance claim under *Strickland* )—in asserting, for example, that endorsing this strategy would cripple *Strickland*-based challenges to prosecutorial misconduct, or would allow prosecutors to "engage in improper conduct without consequence." *Supra* ¶¶ 30–31.

¶ 41 I respectfully dissent. The majority's premise (that the comments were "extremely prejudicial") is overstated. And the resulting conclusion (that the strategy should be rejected) is unfaithful to *Strickland.* I would affirm under *Strickland,* as I read that precedent to foreclose the argument endorsed by the majority.

¶ 42 I would also reject Larrabee's alternative ground for reversal—his notion of error under a so-called doctrine of prosecutorial misconduct. Notwithstanding some dicta in our case law, I find no constitutional or statutory authority for our independent review of the record for an assessment of "prosecutorial misconduct." An appellate court wields only the judicial power afforded by law, and that power is limited to the review of lower-court decisions for error. And with that proper focus (on error), Larrabee's argument fails, as there is no room for a finding of plain error in the district court's failure to interject itself into the proceedings sua sponte.[1]

## I. INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 43 Like the majority, I am troubled by the challenged statements made by the prosecutor in closing argument. The prosecutor's reference to Larrabee's alleged past abuse of the victim's mother ran afoul of the court's ruling *in limine.* An objection could certainly have been made, and probably should have been sustained.

¶ 44 But of course there was no objection, and as the majority properly concludes, Larrabee cannot be deemed to have preserved an objection by filing a motion to arrest judgment. *Supra* ¶ 16. And once we reach that conclusion, the question for our review is limited to the *Strickland* analysis of Larrabee's ineffective assistance of counsel claim. I would analyze that question directly—without the distraction of a subjective assessment of whether the prosecution crossed some ill-

---

1. The majority stops short of engaging the merits of these issues in detail, asserting that they were not preserved and thus are "unnecessary" to our disposition of this appeal. *Supra* ¶ 16, n. 8 (quoting *Summit Water Distribution Co. v. Summit Cnty.,* 2005 UT 73, ¶ 50, 123 P.3d 437). Alternatively, the court notes that our caselaw's endorsement of the doctrine of prosecutorial misconduct is "longstanding" and in line with "a position shared by courts throughout the country." *Id.*

I am unpersuaded. First, Larrabee's prosecutorial misconduct arguments are unnecessary to *the majority's* disposition of the case, but not to mine. A core role of a dissenting opinion is to outline the grounds on which it would dispose of the case—whether or not those grounds are identical to that addressed by the majority. And because I would reject Larrabee's ineffective assistance of counsel ground for reversal, I must proceed to consider his alternative argument for reversal (under a doctrine of direct review of prosecutorial misconduct). So my consideration of these issues is hardly unnecessary, and my opinion not at all "advisory." *See supra* ¶ 16, n. 8 (quoting *Summit Water,* 2005 UT 73, ¶ 50, 123 P.3d 437).

Second, Larrabee's failure "to preserve the issue of prosecutorial misconduct for appeal," *supra* ¶ 16, n. 8, is no barrier to its consideration under the cases he cites. Those cases prescribe a standard for direct review of prosecutorial misconduct *even absent preservation. See infra* ¶ 67 (noting that there was no objection to prosecutorial misconduct in *State v. Ross* and that our analysis asked only whether prosecutor's misstatements were harmless). That is the whole point of an independent doctrine of prosecutorial misconduct. Where prosecutorial statements are met with an objection, the analysis on appeal focuses not on the prosecutor's conduct but on the district court's decision ruling on the objection. So prosecutorial misconduct itself comes into play only in the absence of an objection. (Yet that is the domain of plain error review and of claims for ineffective assistance of counsel. So the notion of a freestanding doctrine of prosecutorial misconduct invades the lines of these doctrines and threatens to distort the law in this important field, in a manner I explain below.)

Finally, the cases cited by the majority are insufficient to persuade me of the wisdom of the court's "endorsement of this doctrine." *Supra* ¶ 16, n. 8. None of these cases even considers—much less refutes—the concerns raised below. And if, as I suggest, this doctrine is incompatible with our adversary system and with venerable limitations on our appellate jurisdiction, then it matters not at all how widely accepted it may be.

defined line of "misconduct." *Supra* ¶ 33. And I would affirm on the ground that there is an easily defensible strategic basis for defense counsel's failure to object to the problematic statement made by the prosecutor in closing argument. In so doing, I would also reject the majority's grounds for avoiding that conclusion.

### A. Strategic Grounds For Counsel's Alleged Failings

¶ 45 The strategic grounds for forgoing an objection in this case are straightforward. The prosecutor's allusion to Larrabee's possible—or hypothetical—abuse of the victim's mother (Jamie) were objectionable. But in my view the majority overstates things in repeatedly characterizing them as "extremely prejudicial" or "inflammatory and prejudicial." *Supra* ¶¶ 20, 22–23. These statements appear to refer to a matter ruled out of bounds on a ruling *in limine*—the matter of Jamie's allegation that she was sexually abused by Larrabee.[2] And for that reason any objection on this matter should properly have been sustained. *See supra* ¶ 27. But again an objection might easily have done more harm than good, and it was accordingly within counsel's strategic judgment to stand pat instead of calling attention to the matter.

¶ 46 The prosecutor's allusion to abuse of Jamie was in the context of a response to defense counsel's argument that Jamie "had it in for" Larrabee and thus had a motive to fabricate the charge of sexual abuse. If Jamie had truly hated Larrabee, she would, in the prosecutor's view, have sought to vindicate her hatred at a time when Larrabee was still involved in her life. It was in advancing this argument that the prosecutor asked "[w]hen he's dragging [Jamie] back to the house in Arizona, how come she doesn't scream and say look what he's doing to me? He's sexually abusing me. He's doing all these things.... Why didn't she have the vengeance then? Why does she wait until she's not in his life at all?" In this context, the problematic import of the reference to abuse of Jamie was relatively minor.[3] It could be understood as a mere hypothetical—as attempting to undermine the prosecution's motive-to-fabricate theory by suggesting that Jamie's alleged hatred could have caused her to fabricate something as outrageous and unfounded as abuse of Jamie.

¶ 47 It could also have been understood as more pernicious. And I do not deny that the reference crossed a line drawn by the judge in her ruling *in limine*. But that is not the question. The question is whether counsel could have had a strategic basis for standing pat instead of asserting an objection. The answer to that question strikes me as clear. In light of the vague, arguably hypothetical nature of the allusion to abuse of Jamie, an objection could easily have done more harm than good.[4] It could have caused the jury to ruminate more extensively about the possibility of actual (not hypothetical) abuse by Lar-

---

2. I take issue, however, with the majority's characterization of the statement as an "explicit[ ] refer[ence] to allegations of child sexual abuse." *Supra* ¶ 23. The comment might have referenced some form of sexual abuse, but it certainly did not *explicitly* argue that it was child sex abuse. *Id.*

3. The majority ignores this important context in noting that "defense counsel should have ... recognized" the remark as "inflammatory." *Supra* ¶ 25. But this context is important. Given that defense counsel had argued that Jamie "had it in" for Larrabee, defense counsel could have reasonably believed that the jury—which had "heard absolutely nothing regarding" a prior instance of child sex abuse—would have viewed the prosecutor's vague statement as a mere hypothetical response to his earlier argument, not as a "bald accusation that the defendant ha[d] a history of child sex abuse" that would have been "shocking" to the jury. *Supra* ¶ 25 n. 23.

4. The point is not that *I* find the remark "vague" or "hypothetical." *Supra* ¶ 25 n. 23. I am only suggesting that those statements *could have been viewed* in that light. And that focus is the right one. *Strickland* does not ask what a reviewing court may think about the impact of the prosecutor's statements. It asks us to place ourselves into defense counsel's shoes in order to assess how counsel would have perceived the prosecutor's statements at the time they were made—giving the benefit of the doubt to the propriety of defense counsel's actions. And, under that standard, if we can articulate a conceivable strategic basis for a failure to object (as I have done), we are required to reject a defendant's ineffectiveness challenge, even if (with the benefit of hindsight) it is now "hard to believe that the impact of th[ose] statements" was "relatively minor." *Supra* ¶ 25 n. 23.

rabee of Jamie, in a manner not easily erased by a clarifying instruction.[5]

### B. *Strickland's Strong Presumption*

¶ 48 Such strategic grounds are easily enough to sustain the determination that counsel's performance survives the "highly deferential" review prescribed by *Strickland. See Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Strickland* established a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" guaranteed by the Constitution. *Id.* Recognizing the "distorting effect[ ] of hindsight," and warning that a "proliferation of ineffectiveness challenges" could "dampen the ardor and impair the independence of defense counsel," the *Strickland* court set a high bar for rebutting the presumption of the propri-

ety of defense counsel's performance. *Id.* at 689–90, 104 S.Ct. 2052. It noted, in particular, that "there are countless ways to provide effective assistance in any given case," and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689, 104 S.Ct. 2052. And of particular importance here, *Strickland* held that counsel's acts or omissions withstand scrutiny—falling squarely within the "strong presumption"—when there is reason to conclude that they "might be considered sound trial strategy." *Id.* (internal quotation marks omitted).

¶ 49 That is certainly the case here, as the notion of minimizing rather than highlighting problematic assertions at closing argument is widely endorsed as a technique of wise trial strategy [6] and likewise upheld under *Strickland* review.[7]

5. *Nelson v. Bayer,* 235 Fed.Appx. 407, 408–09 (9th Cir.2007) (explaining that the "prosecutor . . . may have crossed the line by vouching for the credibility of government witnesses" but concluding that defendant could not "overcome the presumption that his attorney's actions (or inactions) were based on reasonable trial strategy" since objecting might have had "the undesired effect of emphasizing the point in the jury's mind"); *United States v. Habel,* 613 F.2d 1321, 1327 (5th Cir.1980) (explaining that an attorney had chosen to "forego objections for tactical reasons" because he had "concluded . . . that the injurious impact of the repetition of the contents of Ms. Wollesen's deposition would be outweighed by its value as evidence of her bias"); *Caylor v. State,* 255 Ga.App. 362, 566 S.E.2d 33, 35 (2002) (rejecting an ineffectiveness challenge premised on a failure to "object to an argument made by the state's counsel in closing argument" because, despite the impropriety of the statement, "objecting would have drawn greater attention to the statement" and the "curative instruction" that would have been given would have left the jury with the impression that "this is pretty important").

6. *See* Gregory G. Sarno, *Adequacy of Defense Counsel's Representation of Criminal Client Regarding Argument,* 6 A.L.R.4th 16, § 2[b] & n. 74 (1981) ("Whether defense counsel wishes to rebut or 'argue around' improper comments by the prosecutor in the opening statement or the final arguments, or to object to, request a cautionary instruction or an admonition regarding, or seek a mistrial because of, such comments, will inevitably depend on the circumstances. . . . Some of the pertinent inquiries are: Will an objection, successful or not, merely highlight the objectionable comment in the jurors' minds? Is the declaration of a mistrial, even if possible, a desirable end at this point in the litigation, in view of the

way the case has heretofore been proceeding? And how does counsel's client feel about the possibility of undergoing another trial, which may be just as likely to result in an acquittal or conviction as the instant trial irrespective of the dubious remarks?"); *see also* Lori E. Iwan, *Are You Ready for Trial ? Turning Chaos Into Trial Preparation,* 52 No. 9 DRI For Def. 49 (Sept. 2010) ("Preparation also includes knowing when and how to object during a trial for strategic reasons. . . . Objections are not difficult in the abstract. They become difficult in the midst of a trial because you need to determine instantly whether a question or argument is objectionable, and if so, whether you should lodge the objection or waive it. Rather than objecting to each and every 'objectionable' question, for many strategic reasons an attorney may reserve objections. An objection raised in the middle of a long string of boring questions may alert a jury and highlight a particularly sensitive issue. If a colloquy in front of the jury follows an objection, it may highlight an unfavorable issue. Occasionally, when an attorney objects to a question a court reporter must repeat it, reading it aloud before the judge rules, which only emphasizes the unfavorable point, and the error, to the jury. A series of overruled objections could put an objecting attorney in an unfavorable light before a jury. An attorney must quickly assess questions posed to a witness during a trial and decide if objecting has a favorable strategic value." (citations and internal quotation marks omitted)); Maureen A. Howard, *Revisiting Trial Basics Every Time: A Ritual for Courtroom Success,* 34 Am. J. Trial Advoc 335, 362 (2010) ("It is the prerogative of the examining attorney to object when a witness is nonresponsive. The danger is that the objection may well highlight the nonresponsive testimony for the jury. As a general proposition, the 'nonresponsive' objection is a tripartite endeavor: the

## C. Incompatibility of the Majority's Analysis With Strickland

¶ 50 The majority concedes that a decision not to "object can be both strategic and proper." *Supra* ¶ 27. But it declines to extend that principle to this case, citing the "difficult" nature of this case as a ground for drawing the *Strickland* "line in a different place." *Supra* ¶ 28.

¶ 51 I see no room under *Strickland* for the line-drawing engaged in by the majority. *Strickland* draws a bright line—one affording the benefit of any doubt to defense counsel. *See Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. And in close cases like this one, the presumption in favor of trial counsel is dispositive; it requires rejection of a claim for ineffective assistance. *Id.*

¶ 52 In declining to afford trial counsel the benefit of the doubt, the court asserts that accepting the "fear of highlighting" strategy will cripple *Strickland* challenges to prosecutorial misconduct, *supra* ¶ 30; it complains that endorsing that strategy will allow prosecutors to "engage in improper conduct without consequence," *supra* ¶ 31; and it notes that the decision facing trial counsel will often amount to a "Hobson's choice," *supra* ¶ 32. These concerns are both speculative and overstated, and the court's conclusions seem to me to be foreclosed by *Strickland*.

### 1

¶ 53 The court's concerns about the impact of accepting the "fear of highlighting" strategy, *supra* ¶ 30, are overstated. Not all misstatements at trial could strategically be passed over on "highlighting" grounds. Some misrepresentations of the record would prove so misleading that no reasonable defense lawyer could deem the fear of highlighting to outweigh the prejudice it produces. And in such cases, the *Strickland* presumption would be overcome in the absence of any reasonable basis for concluding that counsel's omission "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

¶ 54 The court's concern for the supposed incentive for prosecutorial misconduct is also overstated. It cannot be said that the "highlighting" strategy will "almost always be available to the State" in cases where "defense counsel fails to object to improper comments." *Supra* ¶ 31. Nor is it accurate to say that such strategic basis would "permit the State to engage in improper conduct without consequence," thereby "insulat[ing] the State from objection to its misconduct." *Id.*

¶ 55 *Strickland* applies on a case by case basis, not a categorical one. So the law would not *always* permit the State to defeat an ineffective assistance claim by trotting out a "fear of highlighting" argument. *Strickland* accounts for the complex realities of criminal trials, recognizing that the decision whether to object at closing argument in-

lawyer (1) objects to the testimony as 'nonresponsive,' (2) moves to strike, and (3) asks the judge to give an instruction to the jury to disregard the testimony. Doing this can have the unintended consequence of having the testimony repeated multiple times in front of the jury, which is counterproductive. The better road is often to let the non-responsive answer slide." (citations omitted)); Steven Lubet, *Objecting*, 16 AM. J. TRIAL ADVOC. 213, 219–20 (1992) (explaining that "counsel must evaluate the tactical situation in order to determine whether the objection is worth making" because "[n]ot every valid objection needs to be made" and "there are often good reasons to refrain from objecting," including "possibly los[ing] points with the judge or jury by constantly interrupting the opposition" or fear that an objection might be overruled, which could diminish counsel's credibility in the jury's eyes).

7. *See Nelson*, 235 Fed.Appx. at 408–09 (explaining that the "prosecutor ... may have crossed the line by vouching for the credibility of government witnesses" but concluding that defendant could not "overcome the presumption that his attorney's actions (or inactions) were based on reasonable trial strategy" since objecting might have had "the undesired effect of emphasizing the point in the jury's mind"); *Hansford v. Angelone*, 244 F.Supp.2d 606, 613 (E.D.Va. 2002) (rejecting an ineffectiveness claim premised on failures to object to a variety of prosecutorial statements at opening and closing argument because "it is frequently better to remain silent rather than to draw attention to the matter").

volves a careful weighing of both the concern for prejudice and the problem of highlighting. At some point the concern for prejudice predominates, and the only reasonable response is an objection. Then and only then does the failure to object sustain reversal under *Strickland*. Otherwise it is the province of defense counsel to strike the balance in favor of the decision to forgo an objection and avoid the problem of highlighting.

¶ 56 The question of where to draw the line—of when to object and when to stand pat—is admittedly difficult. I suppose it could even be said that the question puts defense counsel to something of a "Hobson's choice," in which both "alternatives" may seem "equally objectionable." *Supra* ¶ 32. But that is hardly a basis for second-guessing and discrediting counsel's performance as constitutionally deficient. *See supra* ¶ 28 (recognizing that Larrabee's defense counsel faced a difficult decision in knowing whether to object, but nonetheless concluding that he acted ineffectively). *Strickland* dictates the opposite conclusion. It emphasizes the fact that there are "countless ways to provide effective assistance in any given case," and notes that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." 466 U.S. at 689, 104 S.Ct. 2052. And it mandates affirmance—on a presumption of effectiveness—in circumstances where counsel's performance falls within the range of decisions that could be made on matters (such as a Hobson's choice) calling for a subjective judgment-call. *Id.* at 690, 104 S.Ct. 2052.

¶ 57 In any event, I see no reason to expect our application of *Strickland* to "permit[ ] the State to engage in improper conduct without consequence." *Supra* ¶ 32. The potential for a *Strickland* reversal is hardly the only disincentive for prosecutorial error. Prosecutors are officers of the court, whose duty it is to live up to a standard of professionalism and responsibility that extends beyond the short-sighted goal of success in a particular case. We should assume good faith in their performance of that duty. And even in cases where that duty is not enough, there are other downsides beyond *Strickland* reversal. Prosecutors must also

be wary of potential repercussions at trial—from a judge who may call out a prosecutor for crossing a line (on objection or on the judge's own volition) or from a jury whose sense of propriety may likewise be inflamed.

¶ 58 For me this is more than enough to refute the parade of horribles portrayed by the court. A faithful application of the "strong presumption" of *Strickland* can hardly be dismissed as a cataclysmic beginning of the end for prosecutorial ethics. Regardless of *Strickland,* prosecutors will retain plenty of incentives to refrain from misconduct.

### 2

¶ 59 In any event, *Strickland* appears to me to foreclose the majority's analysis. As a subordinate court on matters of federal constitutional law, we are bound to follow *Strickland*—whether or not we find its downsides (in lowering barriers to prosecutorial misconduct, or in burdening ineffective assistance claims that we may deem meritorious) to outweigh its upsides (of avoiding a "proliferation of ineffectiveness challenges" that could "dampen the ardor and impair the independence of defense counsel," *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052.). The U.S. Supreme Court has already struck the policy balance as a matter of federal constitutional law. And we are not at liberty to strike it differently.

¶ 60 In my view our court has effectively done so in carving out "fear of highlighting" considerations as subject to a heightened level of scrutiny. *See supra* ¶ 31 (suggesting that such considerations must be "analyzed with some skepticism"). *Strickland* countenances no hierarchy of strategies. It speaks categorically in prescribing a strong presumption in favor of the propriety of defense counsel's performance, with a safe harbor for any decision that "might be considered sound trial strategy." 466 U.S. at 689, 104 S.Ct. 2052 (internal quotation marks omitted).

¶ 61 That conclusion is reinforced by an extensive body of case law decided in *Strick-*

**1152**

*land*'s wake.[8] In such cases, federal and state courts alike (including this one) have consistently honored the strong presumption in favor of defense counsel's performance in cases where counsel's challenged act or omis-

sion could plausibly be considered sound trial strategy.[9] They have done so, moreover, in cases involving misstatements· by prosecutors.[10]

8. This court itself has reinforced the *Strickland* presumption and its safe harbor for arguable trial strategies. *See State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 ("[D]efendant must overcome the strong presumption that [his] trial counsel rendered adequate assistance, by persuading the court that there was *no conceivable tactical basis* for counsel's actions." (citation and internal quotation marks omitted) (second alteration in original)); *State v. Pecht*, 2002 UT 41, ¶ 41, 44, 48 P.3d 931 ("A defendant cannot prevail on a claim of ineffective assistance of counsel where the challenged act of omission might be considered sound trial strategy.... The failure of trial strategy ... does not indicate ineffectiveness of counsel.").

9. *See, e.g., Gonzales*, 2005 UT 72, ¶ 72, 125 P.3d 878 (concluding that counsel had not been ineffective in withdrawing her objection to the admission of irrelevant and unfairly prejudicial information since "an attorney's performance will be held ineffective only when there is no tactical or strategic justification for his conduct" and, in this instance, counsel "may have felt that the objection was futile and chose not to object for strategic reasons (such as not drawing attention to this unfortunate information)" (internal quotation marks omitted)); *United States v. Roston*, 26 Fed.Appx. 677, 678 (9th Cir.2002) (concluding that defendant was unable to show that "counsel's performance fell outside a wide range of reasonableness" because "even if counsel failed to object, he chose to do so for strategic reasons"); *People v. Brown*, 17 N.Y.3d 742, 743–44, 929 N.Y.S.2d 12, 952 N.E.2d 1004 (N.Y.2011) (rejecting a defendant's assertion that he had been denied ineffective assistance of counsel by "his defense lawyer's failure to object" because defendant "failed to meet his burden of demonstrating a lack of strategic or other legitimate reasons" for that failure and because "the prosecutor's remarks impugned the People's witnesses as well as defendant and therefore were consistent with his own theory that the People's witnesses were simply not credible."); *Reed v. State*, 285 Ga. 64, 673 S.E.2d 246, 248–49 (2009) (rejecting the contention that defense counsel had performed ineffectively because there were legitimate, tactical bases for all of defense counsel's actions); *State v. Watson*, 921 So.2d 774, 775 (Fla.Dist.Ct.App.2006) (rejecting an ineffectiveness challenge because there was no evidence that a "failure to object to the seating of the jurors in question was not a strategic decision on [defense counsel's] part.").

10. *Schauer v. McKee*, 401 Fed.Appx. 97, 101 (6th Cir.2010) (holding that a failure to object to prosecutorial statements was not deficient performance under *Strickland* because "[n]ot drawing attention to [a] statement may be perfectly sound from a tactical standpoint" (internal quotation marks omitted)); *Nelson*, 235 Fed.Appx. at 408–09 (explaining that the "prosecutor ... may have crossed the line by vouching for the credibility of government witnesses" but concluding that defendant could not "overcome the presumption that his attorney's actions (or inactions) were based on reasonable trial strategy" since objecting might have had "the undesired effect of emphasizing the point in the jury's mind"); *Bennett v. Angelone*, 92 F.3d 1336, 1349 (4th Cir.1996) (rejecting the contention that trial counsel had been ineffective in failing to object in the face of "improper" prosecutorial statements that were "religiously loaded" and also "alluded to Lee Harvey Oswald and a string of murders committed by the Hanafi Muslim sect" in a way that "clearly risked confusing the jury and arousing its prejudices by referring to notorious and grisly crimes not at issue in this case," because trial counsel did not object since "they did not want to appear overly antagonistic to the jury and wanted to portray themselves 'as the good guys'" and "refraining from objecting to avoid irritating the jury is a standard trial tactic"); *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir.1993) (concluding that defendant had not been denied effective assistance of counsel where his counsel had failed to object to prosecutor's allegedly-improper vouching at closing argument because "many lawyers refrain from objecting during opening statement and closing argument" so this failure to object was "within the wide range of permissible professional legal conduct" (internal quotation marks omitted)); *Hansford*, 244 F.Supp.2d at 613 (rejecting an ineffectiveness claim premised on failures to object to a variety of prosecutorial statements at opening and closing argument because "it is frequently better to remain silent rather than to draw attention to the matter"); *Dunlap v. People*, 173 P.3d 1054, 1080–81 (Colo.2007) (rejecting an ineffective assistance challenge premised on a failure to object to a prosecutorial comment because it was a "reasonable strategic position" to "not object at every potential opportunity during trial because" doing so "decreases an attorney's credibility with the jury and calls undue attention to the objectionable material"); *Day v. Commonwealth*, 2003 WL 22220323, at * 3 (Ky.Ct.App. 2003) (explaining that defense counsel's failure to object to the prosecutor's closing remarks "did not amount to a deficient performance" because even if the remarks were improper, "an objection at that point in the proceedings might have served only to highlight the details of the attack."); *Hamm v. State*, 913 So.2d 460, 488 (Ala.Crim.App.2002) (rejecting an "ineffective assistance" challenge based on a failure to object

¶ 62 We should follow these cases—and the U.S. Supreme Court decision that spawned them. Faithfully applied, that authority requires affirmance. I respectfully dissent on that basis.

## II. PROSECUTORIAL MISCONDUCT AND PLAIN ERROR

¶ 63 I would also reject Larrabee's alternative ground for reversal, which is rooted in a so-called doctrine of prosecutorial misconduct. In support of this argument, Larrabee invokes case law purportedly calling for reversal in the face of prosecutorial statements that "call to the attention of ... jurors matters which they would not be justified in considering in determining their verdict," *see State v. Ross*, 2007 UT 89, ¶ 54, 174 P.3d 628—at least where jurors were "probably influenced by those remarks," *id.*, and where the prosecutor's comments were "so obviously improper that the trial court had an opportunity to address the error," *State v. Calliham*, 2002 UT 86, ¶ 62, 55 P.3d 573.

¶ 64 The standards invoked by Larrabee are problematic. His notion of a standalone doctrine of prosecutorial misconduct is a distortion of our adversary system, of our law of preservation, and of the constitutional and statutory restraints on our appellate power. And his proposed standard of review is an effective override of the settled plain error standard.

¶ 65 I would accordingly reject the premises of Larrabee's argument. In so doing, however, I would recognize that our case law leaves some room for his proposed approach. I would acknowledge, in particular, that our cases have apparently characterized "prosecutorial misconduct" as a standalone basis for direct review of the actions of prosecutors. *See e.g., Ross*, 2007 UT 89, ¶ 54, 174 P.3d 628. And I would concede that we have also suggested that prosecutorial misconduct may somehow lower the showing required to demonstrate plain error. *See Calliham*, 2002 UT 86, ¶ 62, 55 P.3d 573.

¶ 66 In noting these strands of our case law, however, I would definitively repudiate them. I would find them incompatible with the constitutional and statutory limits on our jurisdiction, and with longstanding tenets of the adversary system and of appellate review. We should repudiate the above-noted case law on those grounds. I would do so here, and I would reject Larrabee's alternative ground for reversal on that basis.

### A. Prosecutorial Misconduct and the Law of Preservation

¶ 67 *State v. Ross* involved an appeal from a conviction for aggravated murder, in which the defendant claimed that the prosecutor had "committed prosecutorial misconduct during closing argument." 2007 UT 89, ¶ 3, 174 P.3d 628. In affirming (in part), we noted that the prosecutor's statements drew no objection, and purported to apply a plain error standard of review. *Id.* ¶ 53. Yet we did not proceed to analyze the question whether there was plain error *in the failure to exclude* the prosecutor's statements. Instead we "consider[ed] whether the State's remarks during closing arguments constitute[d] prosecutorial misconduct," set forth a two-part "test for prosecutorial misconduct," and analyzed the matter in terms of whether the *prosecutor's remarks* were harmless (not whether there was plain error in failing to exclude them sua sponte). *Id.* ¶¶ 53–58.

¶ 68 Larrabee invokes *Ross* as a basis for a standalone doctrine of prosecutorial misconduct—for a doctrine of direct review of prosecutorial acts, independent of any review of lower court decisions. I would repudiate that reading of *Ross*, and thus reject it as an alternative ground for reversal.

to "remarks inflaming the passions of the jurors and urging them to 'send a message' that the community would not tolerate such killings in the county" because this could have been based on the "legitimate trial strategy" to "avoid infuriating the jury by making needless objections" and "maintain[ing] a good relationship with the jury"); *Caylor*, 566 S.E.2d at 35 (rejecting an ineffectiveness challenge premised on a failure to "object to an argument made by the state's counsel in closing argument" because, despite the impropriety of the statement, "objecting would have drawn greater attention to the statement" and the "curative instruction" that would have been given would have left the jury with the impression that "this is pretty important").

### 1

¶ 69 Our power to decide cases on appeal is defined by article VIII section 3 of the Utah Constitution. Under that provision, we have the power to issue writs and to exercise "appellate jurisdiction over all other matters to be exercised as provided by statute." UTAH CONST., art. 8, § 3.[11] Our jurisdictional statutes, in turn, confine our power to the review of "judgments," "orders," and "decrees" of the lower courts and agencies in our state system.[12]

¶ 70 These provisions are clear and unequivocal. They limit our authority to the review of lower court decisions. We have no power, under the jurisdictional statutes incorporated by reference in our constitution, to embark on a broader quest for justice.

### 2

¶ 71 This framework is hardly unique to Utah. It is a reflection of an approach to appellate review that was embraced long ago in courts throughout the United States. That approach involved the adoption of a "writ of error" model of appellate review—and the corresponding rejection of the "appeal in equity" model. See Robert J. Martineau, Considering New Issues on Appeal: The General Rule and the Gorilla Rule, 40 VAND. L.REV. 1023, 1026–28 (1987).

¶ 72 Both models are found in our British common law roots. Historically, the "appeal in equity" provided for review "de novo"—a review in which "[t]he appellate court could review the entire case, both law and facts, and render any type of judgment it thought justice demanded, without regard to whether the issue upon which the appellate court based its judgment had been presented to the lower court." Id. at 1027. The writ of error model, by contrast, called only for a determination "whether the judge had made an error." Id. at 1026–27.

¶ 73 "American appellate procedure followed the writ of error model rather than the appeal in equity" approach. Id. at 1027–28. Consequently, American appellate courts do not supervise trials and do "not ... test whether the proper party ha[s] won." Id. at 1026. Rather, they review decisions made by lower courts for error. See Peatross v. Bd. of Comm'rs of Salt Lake Cnty., 555 P.2d 281, 284 (Utah 1976) ("Appellate jurisdiction is the authority to review the actions or judgment of an inferior tribunal upon the record made in that tribunal, and to affirm, modify or reverse such action or judgment.").[13]

¶ 74 Our constitution and governing jurisdictional statutes unequivocally embrace this model. We should accordingly reject those elements of our prior case law that appear to

11. Our so-called "supervisory authority" does not alter the landscape. That authority falls outside the bounds of adversary proceedings. It is the power to promulgate rules, such as those governing members of the bar. See UTAH CONST., art. 8, § 4 ("The Supreme Court by rule shall govern the practice of law, including admission to practice law and the conduct and discipline of persons admitted to practice law." (emphasis added)). Our supervisory power is accordingly disconnected from our judicial power to decide cases. It is not an end-run around traditional limitations on our appellate jurisdiction.

12. See UTAH CODE § 78A–3–102(3)(a) ("The Supreme Court has appellate jurisdiction, including jurisdiction of interlocutory appeals, over: ... a judgment of the Court of Appeals"); UTAH CODE § 78A–3–102(3)(b) (granting jurisdiction over "cases certified to the Supreme Court by the Court of Appeals prior to final judgment by the Court of Appeals"); id. § 78A–3–102(3)(d) (granting jurisdiction over "final orders of the Judicial Conduct Commission"); id. § 78A–3–102(3)(e) (granting jurisdiction over "final orders and decrees in formal adjudicative proceedings

originating with" a variety of entities, including the "Public Service Commission"); id. § 78A–3–102(3)(j) (granting jurisdiction over "orders, judgments, and decrees of any court of record over which the Court of Appeals does not have original appellate jurisdiction"). Compare 28 U.S.C. § 1291 ("The courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts of the United States. . . .").

13. See also Marbury v. Madison 5 U.S. (1 Cranch) 137, 175, 2 L.Ed. 60 (1803) (noting that the "essential criterion of appellate jurisdiction" is "that it revises and corrects the proceedings in a cause already instituted, and does not create that cause"); Ex Parte Watkins, 32 U.S. 568, 572–73, 7 Pet. 568, 8 L.Ed. 786 (1833) (explaining the difference between "appellate" and "original" jurisdiction and concluding that review of a lower court's ruling on a habeas petitioner was appellate because it sought to "revise the acts of the circuit court").

endorse a wide-ranging authority to seek justice without regard to error.

### B. Plain Error Review

¶ 75 Because we lack the authority to review the prosecutor's statements directly, we are left only to review *the district court's judgment* for error. And the only decision ripe for our review is the trial court's failure to intervene in the prosecutor's closing argument. I would review that decision under a plain error standard (since there was no objection), and I would find no difficulty affirming.

¶ 76 "Plain error" is an exception to our preservation rules. It allows us to consider certain matters never raised for consideration by the lower court, but only in limited circumstances defined by our cases. *See State v. Harris*, 2012 UT 77, ¶ 24, 289 P.3d 591 (defining plain error as a "carefully circumscribed exception to the requirement of preservation" that "[w]e invoke ... sparingly," and noting that an error can be plain only if it "should have been obvious to the trial court").

¶ 77 Larrabee advocates an altered standard of plain error review. Citing *Calliham,* 2002 UT 86, ¶ 62, 55 P.3d 573, he asserts that

his burden is not to demonstrate an "obvious" error in the district court's decision (not to exclude the prosecutor's statements sua sponte), but only to show that the prosecutor's statements were sufficiently obvious that "the trial court had an opportunity to address the error." *Id.* I would not read *Calliham's* dictum to override our longstanding standard of plain error. That standard is well-embedded in our case law, and entirely incompatible with the mere "opportunity" standard advanced by Larrabee. We should repudiate the *Calliham* dictum and reiterate that unpreserved objections to prosecutorial misstatements are reviewed under a standard plain error standard.

¶ 78 Ours is an adversary system. For a variety of good reasons,[14] our system leaves evidentiary objections in the hands of the parties. It recognizes that "the judge's gatekeeping responsibility is defined and shaped by the objections and motions made by counsel." *Wilson v. IHC Hospitals, Inc.,* 2012 UT 43, ¶ 135, 289 P.3d 369 (Lee, J., dissenting).[15] Thus, we do not generally expect the trial judge to interject himself into the process.[16] We acknowledge that a judge is "not to undertake proactive, sua sponte efforts to keep inadmissible evidence from

**14.** One of these reasons is that sua sponte intervention can interfere with the trial strategy of the parties. *See Willis v. Kemp,* 838 F.2d 1510, 1519 n. 19 (11th Cir.1988) (noting, in the context of a habeas claim, that "the sua sponte delivery of a curative instruction" in the face of prosecutorial misconduct might "defeat defense strategy"); *see also State v. Perry,* 124 N.J. 128, 590 A.2d 624, 641 (1991) (rejecting a defendant's assertion that it had been plain error for the trial court to fail to issue a sua sponte jury instruction on self defense because there was a "non-compatible defense strategy" and "courts must carefully refrain from preempting defense counsel's strategic and tactical decisions and possibly prejudicing defendant's chance of acquittal").

**15.** *See also State v. King,* 2006 UT 3, ¶ 14, 131 P.3d 202 (citing *Polster v. Griff's of Am., Inc.,* 184 Colo. 418, 520 P.2d 745, 747 (1974), for the general rule that "the trial court has no duty to question each piece of evidence offered.... It should not assume the role of advocate and on its own motion, without request therefor, limit, comment upon, qualify, or strike evidence offered by the parties. These are the basic functions of trial counsel in our adversary system of justice and underlie the rationale of the contem-

poraneous objection rule"); *see also* UTAH R. EVID. 103(a) (noting that "[a] party may claim error in a ruling to admits or exclude evidence only if the error affects a substantial right of the party and" the complaining party either "timely objects [to] or moves to strike" admitted evidence).

**16.** *See, e.g., King,* 2006 UT 3, ¶ 22, 131 P.3d 202 (rejecting a plain error challenge to a trial court's failure to sua sponte intervene in the jury selection process and noting that "[i]t is generally inappropriate for a trial court to interfere with counsel's conscious choices in the jury selection process, notwithstanding the existence of a reasonable basis for objecting to those jurors" (internal quotation marks omitted)); *Wilson,* 2012 UT 43, ¶ 133, 289 P.3d 369 (Lee, J., dissenting) ("[I]n my view the trial judge did all that he was appropriately asked to do in response to objections to defense counsel's questions about collateral source material. It may well be, as the majority suggests, that the court could have done more, but the fact of the matter is that plaintiffs' counsel never asked the trial judge to undertake additional curative measures. And since the trial judge was never asked to do so, he cannot in my view be reversed for failing to undertake further measures sua sponte.").

affecting the jury," but only "to make appropriate rulings on objections or motions made by counsel in that regard." *Id.*[17]

¶ 79 Even on plain error review, the appellate role is informed by the writ-of-error model. Our review is not an ethereal search for justice, but a determination whether the lower court plainly erred in not resolving sua sponte a matter not preserved by the parties. *See King,* 2006 UT 3, ¶ 22, 131 P.3d 202 (explaining that the first element of "plain error" is a showing that the "trial court erred" by "acting beyond the limits of reasonability" (internal quotations marks omitted)).[18]

¶ 80 Sua sponte intervention is particularly problematic at the closing argument stage, when counsel is granted substantial leeway. *Dibello,* 780 P.2d at 1225. For all the reasons explained in part I above, defense counsel could reasonably have decided that the prosecutor's statements were better ignored than highlighted. And there is accordingly no basis for a determination of error on the part of the district court—much less error that is "plain."

---

**17.** At an appropriate point, we should reexamine those elements of our "plain error" case law that ignore this fundamental point. *See, e.g., State v. Emmett,* 839 P.2d 781, 786 (Utah 1992) (concluding that the prosecutor's conduct was "obvious error" within the meaning of the "plain error" doctrine without recognizing that this holding suggested that the trial court was required to take the extraordinary step of interjecting itself sua sponte into the proceedings); *State v. Young,* 853 P.2d 327 (Utah 1993) (concluding that an opening statement by the prosecutor, along with some of the questions he posed to a witness, constituted obvious prosecutorial misconduct within the meaning of the plain error doctrine, but not applying the doctrine because the defendant had failed to show prejudice); *State v. Saunders,* 992 P.2d 951 (Utah 1999) (concluding that comments made at closing argument constituted reversible error under the plain error standard); *Calliham,* 2002 UT 86, ¶ 62, 55 P.3d 573 (discussed above); *Ross,* 2007 UT 89, ¶ 57, 174 P.3d 628 (concluding that statements made by a prosecutor at closing argument were obvious error, but declining to apply plain error after concluding that the error was harmless). Any rule that routinely requires sua sponte intervention by the trial court is incompatible with our adversary system—and the writ of error model through which it operates.

**18.** *See also Jacob v. Bezzant,* 2009 UT 37, ¶ 34, 212 P.3d 535 (noting that plain error review is an exception in circumstances where the "[district] court committed plain error" (alteration in original)); *Hill v. Estate of Allred,* 2009 UT 28, ¶ 24, 216 P.3d 929 (explaining that plain error review applies "if the lower court committed plain error"); Robert J. Martineau et al., Appellate Practice and Procedure: Cases and Materials 190 (2d ed. 2005) ("[T]he exception to the general [preservation] rule most often used by appellate courts is when the *trial court* makes an error that is described as plain, basic or fundamental" (emphasis added) (internal quotation marks omitted)).